## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE: WRIGHT MEDICAL TECHNOLOGY INC., CONSERVE HIP IMPLANT PRODUCTS LIABILITY LITIGATION | **MDL DOCKET NO. 2329**<br><br>**This Document Relates to:**<br>**ROBYN CHRISTIANSEN**<br>**1:13-cv-297-WSD** |
| ROBYN CHRISTIANSEN,<br><br>               **Plaintiff,**<br><br>    **v.**<br><br>WRIGHT MEDICAL TECHNOLOGY INCORPORATED,<br><br>               **Defendant.** | **1:13-cv-297-WSD** |

## OPINION AND ORDER

This matter is before the Court on Defendant Wright Medical Technology,

Inc.'s ("Defendant" or "Wright Medical")[1] Renewed Motion for Judgment as a

---

[1]      Wright Medical Group, Inc. ("Wright Group"), Wright Medical's parent corporation, was also a defendant in this case. At the conclusion of Plaintiff's case-in-chief, Wright Group moved for judgment as a matter of law on all of Plaintiff's claims against it. Wright Group argued that Plaintiff did not present any evidence to show that it was responsible for the design of the hip replacement device, or for any of the alleged misrepresentations or concealment of material facts. With Plaintiff's consent, the Court dismissed Wright Group from this action.

Matter of Law, or in the Alternative, Motion for New Trial and to Amend the

Judgment [241] ("Renewed Motion").[2]

## I.   BACKGROUND[3]

Plaintiff Robyn Christiansen ("Plaintiff") filed this action against Defendant

Wright Medical based on the failure of the Wright Conserve Hip Implant System

(the "hip replacement device") that was surgically implanted on April 24, 2006, to

replace Plaintiff's right hip.  On November 9, 2015, trial began on Plaintiff's

claims for: (1) Strict Product Liability (Design Defect) (Count I); (2) Negligence

(Design Defect) (Count III); (3) Fraudulent Misrepresentation (Count V);

(4) Fraudulent Concealment (Count VI); and (5) Negligent Misrepresentation

(Count VII), and her demand for compensatory and punitive damages.

On November 16, 2015, after Plaintiff concluded her case-in-chief,

Defendant moved, under Rule 50 of the Federal Rules of Civil Procedure, for

judgment as a matter of law on Plaintiff's claims for: (1) fraudulent

misrepresentation; (2) fraudulent concealment; (3) negligent misrepresentation;

---

[2]    Unless otherwise identified as docketed in the MDL Case, the Court will cite
to documents in Christiansen v. Wright Medical Technology Inc., No. 1:13-cv-297
(N.D. Ga. 2013).
[3]    In the "Introduction" and "Background" sections of its August 31, 2015,
Order [167], the Court set forth the factual and procedural background for this
case.  (August 31, 2015, Order, at 1-9).  These sections are incorporated by
reference.  The Court here discusses only the background relevant to the Renewed
Motion.

and (4) punitive damages.  ([239]).  The Court declined to rule on the motion at

that time, and trial proceeded.  (Trial Transcript [226]-[236] at 921:21-922:16).[4]

On November 18, 2015, Defendant renewed its Rule 50 motion at the close

of evidence.  Defendant also argued that Comment k of Section 402A of the

Restatement (Second) of Torts ("Comment k") bars Plaintiff's strict liability claim

for design defect, and that the Court should grant judgment as a matter of law on

this claim.  The Court submitted the case to the jury, allowing Defendant to renew

its motion for judgment as a matter of law, for a new trial, or both, after the jury

returned its verdict.  ([212]).

On November 19, 2015, the Court held its charge conference (the "Charge

Conference").  The Court discussed the proposed jury charges, including proposed

charges on strict product liability (design defect), fraudulent misrepresentation,

negligent misrepresentation, fraudulent concealment, negligence, comparative

fault, and compensatory and punitive damages.  (Tr. at 1346-1401).  There was

only one objection at the Charge Conference, and that was based on the Court's

charge on Defendant's Comment k defense.  (Tr. at 1414:6-18).  The charge

---

[4]     Ultimately this motion was subsumed by Defendant's November 18, 2015, motion, filed at the close of evidence.

required Defendant to prove three things to prevail on its Comment k defense:

> (1) When the hip replacement device was made, it could not be made safe for its intended use even applying the best available testing and research;
>
> (2) The benefit of the hip replacement device justified its risk; and
>
> (3) The hip replacement device, properly manufactured, was accompanied by proper directions and warnings.

(Id. at 1414:11-14, 1416:5-21).  Defendant objected to the third element, arguing it was not required under Utah law and was not otherwise a requirement of Comment k.  (Id. at 1414:2-5, 1414:17-18, 1417:6-13).

The proposed verdict form also was discussed at the Charge Conference. (Id. at 1401-19).  The Court, in consultation with the parties, made certain revisions to the verdict form.  One change suggested by the Court and agreed to by the parties was to require the jury to make special factual findings on each of the three prongs the Court determined Defendant must prove for its Comment k defense.  ([219.1] (the "Original Verdict Form") at 7).

The general structure of the Original Verdict Form was that it contained questions required to be answered followed by instructions on how to proceed depending on answers to the questions.  The first question on the Original Verdict Form, Question 1A, stated: "Do you find by a preponderance of the evidence that Wright Medical's hip replacement device was defectively designed?"  (Original

4

Verdict Form at 1).  The jury was required to answer "Yes" or "No."  The bolded

instruction after Question 1A stated: "If you answered NO to Question 1A, stop,

and sign and date this form.  If you answered YES to Question 1A, proceed to

Question 1B."  (Id.).  The purpose of this instruction was to ensure that if the jury

concluded the hip replacement device was not defectively designed, it would cease

its deliberations, because without a finding of defect, Plaintiff could not prevail on

any of her claims.  (See Tr. at 1402:7-21).

After closing arguments, the Court charged the jury.  (Id. at 1423-1506).

The Parties did not object to the charge as given.[5]  (Id. at 1506:9-14).  The Court

gave the jury the Original Verdict Form for use in its deliberations.

On November 20, 2015, the jury notified the Court that it had reached a

verdict.  (Id. at 1518).  The jury returned to the courtroom and the completed

Original Verdict Form was given to the Court for review.  The Court reviewed the

form and instructed the courtroom deputy to read it.  (Id. at 1519:3-4).

After the courtroom deputy read the answer to Question 1A as "No," the

Court, recognizing that the Original Verdict Form had an inconsistency in it, told

the courtroom deputy to stop reading the form so the Court could reexamine it

further.  (Id. at 1519:5-15).  Upon review of the Original Verdict Form, the Court

---

[5]    Defendant noted its previous objection to the third Comment k defense element.

discovered that the jury had completed the form inconsistently with the instructions on the form, including the instruction telling them what to do if they answered "No" to Question 1A. The instruction provided that a "No" answer to Question 1A required the foreperson to "stop, and sign and date this form." (Original Verdict Form at 1). Reviewing the Original Verdict Form as a whole, the Court noted the inconsistency in how it was completed. The Court noted that the answer to Question 1A was that Wright Medical's hip replacement device was not defectively designed, meaning the jury was to date and sign the form. Instead, the jury continued answering questions on the form including by finding that Wright Medical had made negligent misrepresentations to Plaintiff as to the hip replacement device, and that Plaintiff should be awarded $662,500 in compensatory damages on the negligent misrepresentation count, and $2.5 million in punitive damages. (Id. at 4, 6). The jury also concluded that Plaintiff was partially at fault for causing her injuries, attributing 24.24% of the fault to her. (Id. at 6). These findings were not consistent with the initial finding of no defect. The Original Verdict Form, as completed, indicated to the Court that the jurors were confused either about their findings, or how the Original Verdict Form should be completed, or both.

The Court instructed the jury to take the Original Verdict Form back to the jury room and to carefully reread the form to evaluate whether they had completed it properly.  (Tr. at 1519:16-20).  The Court explained to the jury that the Original Verdict Form was drafted to guide them through findings they needed to make and findings they were not to make, depending on how they answered the questions on the form.  (Id. at 1521:13-23).  The Court provided a clean copy of the Original Verdict Form, and instructed the jury to go back to the jury room and read it out loud to ensure that they all understood the specific instructions that applied to the questions.  (Id. at 1522:7-12).  The Court instructed the jury that, should their understanding of the form impact their thinking about the verdict, they should discuss that with each other.  (Id. at 1522:13-16, 1523:2-13).

After the jury left the courtroom, Defendant objected to the instructions the Court gave to the jury, and moved that the Court accept the jury's answer to Question 1A of the Original Verdict Form, and mold the remainder of the Original Verdict Form "to reflect judgment for defendant and against plaintiff . . . ."  (Id. at 1523:19-1524:20).  The Court denied Defendant's motion, finding that the jury did not understand the instructions on the Original Verdict Form.  (Id. at 1524:21-1525:7).

A few minutes later, the jury notified the Court that it did not understand the Original Verdict Form and that they wanted an additional explanation of it. (Id. at 1525:23-1526:1). Without the jury present, the Court and counsel for the parties discussed how to revise the verdict form to better instruct the jury on how they were required to proceed based on how they answered each question. (Id. at 1526:2-1529:5). The Court suggested amending the verdict form to replace "stop, and sign and date this form" to state clearly that if the jurors answered "No" to Questions 1A, 1B, 1D, or 1E, they should stop completing the form and tell the Court they had reached a verdict. (Id. at 1526:13-21). The parties did not object to modifying the verdict form in the manner discussed although Defendant stated it was doing so subject to its earlier motion for entry of judgment in its favor. (Id. at 1527:7-10, 1527:24-1528:1, 1528:23).

The Court prepared a revised verdict form with the agreed revised instructions. ([225.5] at 61-67 (the "Supplemented Verdict Form")). The revised instructions directed what the jury should do if they answered "No" to Questions 1A, 1B, 1D, or 1E. The instructions were in the following form:

> If you answered "No" to Question 1A, stop. Do not complete the remainder of the form. The foreperson should sign and date the form and tell the Court Security Officer you have a verdict.

(Supplemented Verdict Form at 1).  The Court drafted the following note to be

attached to the revised form when it was delivered to the jury:

> Ladies and Gentlemen:
>
> In response to your comment that you do not understand the verdict
> form, I have revised the form by adding clarifying language in certain
> of the instructions.  The instructions where clarifying language was
> added are identified with an asterisk.
>
> If this language does not answer all of your questions about how to
> complete the form, please tell the Court Security Officer so I can
> respond before you continue your deliberations.
>
> Finally, if in following the instructions you were required to answer
> Question 1C, please make the Special Factual Findings on page 7.  If
> you ended up not answering Question 1C, do not make the Special
> Factual Findings on page 7.

([225.5] at 60) (the "Explanatory Note")

The parties agreed to the Supplemented Verdict Form and the Explanatory

Note, although Defendant did so subject to its earlier motion for entry of judgment

in Defendant's favor.  (Tr. at 1530:6-7, 1534:9-12).

Plaintiff also requested that the Court reinstruct the jury.  (Id. at 1531:5-12).

Defendant objected to the reinstruction request.  (Id. at 1532:12).  The Court

concluded that reinstructing the jury on the charges would assure the instructions

would be fresh in their minds when they received the Supplemented Verdict Form.

(Id. at 1532:12-21).

The jury was recalled to the courtroom where the Court explained that it was going to reinstruct them on the law and provide them with a revised verdict form. (Id. at 1536:3-22).  The Court repeated its jury charge in its entirety.  (Id. at 1537-1563).  The Court then stated that the jury would receive the revised verdict form.  The Court read the Explanatory Note to the jury before the Supplemented Verdict Form and the Explanatory Note were given to them.  (Id. at 1563:24-1564:21).  The Court told the jury that when they returned to the jury room they should review the Supplemented Verdict Form and, if they did not understand its instructions, they should notify the Court.  (Id. at 1564:22-1565:1). The jury returned to the jury room to deliberate.  About half an hour later, the Court released the jury for the weekend.  (Id. at 1570:11-12).

On Monday morning, the jury continued their deliberations.  At about 2:00 p.m., the jury notified the Court that they were unable to reach a unanimous verdict.  (Id. at 1574:8-10).  The Court, with agreement of the parties, sent this written note to the jury:

> I have received and carefully reviewed your note.  Considering the length of time you have been deliberating, you should continue your deliberations in an effort to reach a verdict.

(Id. at 1574:14-22).  At approximately 5:00 p.m., the Court released the jury for the day.  (Id. at 1575:13-15).

10

The jury continued their deliberations the next day.  At about 2:00 p.m., the Court received a note from one of the jurors stating that the juror had personal and professional obligations with which the trial was interfering.  (Id. at 1583:8-1584:9).  The note stated that the deliberations were taking an "extensively long time as one of the jurors doesn't look at the evidence through the perspective of the law . . . ."  (Id. at 1583:22-25).  Because the jury was still deliberating, the Court decided to wait until the end of the day to consider the note.  (Id. at 1584:10-12).  The parties agreed with this decision.  (Id. at 1585:1-4).

A couple of hours later, the Court received a note from the foreperson, which stated: "We are unable to provide a verdict and complete the verdict form. We have one juror that has decided no longer to participate in the jury and the process to reach a unanimous verdict."  (Id. at 1585:8-10, 1586:3-7).

The two notes, read together, indicated to the Court that there was a juror that may be impacting the jury's efforts to reach a verdict.  (Id. at 1586:8-10).  The parties agreed that the juror should be identified to the Court and that the Court should discuss the juror's participation in deliberations.  (Id. at 1586:10-17, 1588:11-16).  The Court advised that a lawyer for each party would observe the Court's meeting with the juror.  (Id. at 1593:4-7).

The Court first spoke with the foreperson in chambers and asked her to identify the juror who was not participating in the deliberations.  Counsel for the parties was present.  The foreperson identified the juror in question (the "Juror"). (Id. at 1600:3-20).

About five minutes later, the Court, with counsel for each party present, met with the Juror in chambers.  (Id. at 1601:6-8, 18-24).  The Court told the Juror the Court was not asking the Juror what decisions he or the other jurors had reached and it did not ask on what question or questions in the Supplemented Verdict Form the jurors had differing opinions.  The Court then proceeded to ask the Juror a number of questions about whether the Juror could follow the Court's instructions, including those on the Supplemented Verdict Form.  (Id. at 1602:13-1606:25).

The Court asked if the Juror disagreed with the conclusion and verdict the other jurors wanted to reach and if that made him not want to deliberate any further.  (Id. at 1602:18-24).  The Juror agreed with that statement and, in response to additional questions, further explained that part of the problem was there was a principle of law with which he did not agree, and part of the issue was that there were instructions that he did not think he could follow.  (Id. at 1603:8-24, 1605:6-25, 1606:6-14).

The Juror was temporarily excused while the Court discussed with counsel the Juror's answers to the Court's questions.  Counsel for Defendant generally agreed the Juror had stated he could not follow the instructions given to him by the Court, including those in the Original Verdict Form.  (Id. at 1607:3-22).  Counsel for Defendant, however, asked the Court to clarify whether the Juror was saying he was unable to follow the Court's instructions or whether it was his fellow jurors who refused to follow the instructions.  (Id. at 1607:22-1608:2).  The Court agreed to seek this clarification, and the Juror returned to chambers, where the following exchange occurred:

> THE COURT: So I don't want to focus on any specific question, but has there been during your deliberations a question where you have voted with the others on how to answer the question—have there been times when you agreed with the answer to the question? Has that happened?
>
> JUROR: Yes, it has.
>
> THE COURT: And then when you go down and look at the instruction, is the answer to that question an instruction that you disagree with and that you haven't been able to follow?
>
> JUROR: Haven't been able to follow?  In some instance, yes.
>
> THE COURT: And is that because you disagree that the instruction would lead to a result that you think should happen?
>
> JUROR: My answer is different from what some of the others had, yes.

THE COURT: And when you say your answer—you answered differently, there are others that say here is what the instruction says, this is what we have to do, is it your position is I know that's what the instruction says, but I can't agree with it because I think that would lead to the wrong result?

JUROR: Yes, sir.

(Id. at 1609:11-1610:10).  After these questions were answered, the Court again excused the Juror and consulted with counsel about whether his statements showed he was unwilling to follow the Court's instructions.  The Court summarized the Juror's response to the Court's further questions:

THE COURT: I think that clarifies that he is unable to follow the instructions on the verdict form.  Do you agree?

MR. ASH: Yes, sir.

THE COURT: Do you agree, Mr. Boucher?

MR. BOUCHER: I don't know.  I think that the answer is yes.  I think he's having a difficult time following the verdict form and agreeing to what the verdict form directs him to do.

THE COURT: Well, I think from what he said it goes further than that.  He understands the instruction and that there has been one and maybe more than one instance where he has read the instruction and has not agreed to follow it because he disagrees with the result that it leads to.  Isn't that what he said, that that's actually happened?

MR. BOUCHER: I think that's what he said.

THE COURT: And I think having had this discussion, we all agree that the instructions are integral to—the instructions on the verdict

14

form are integral to the overall instruction on the law that I give and
they must follow it to get a correct legal result.

MR. BOUCHER: Yes.

THE COURT: Mr. Ash?

MR. ASH: I agree.

(Id. at 1610:16-1611:14). The Court concluded that the Juror had refused to follow

the instructions on the verdict form, thus was not participating in deliberations, and

that he was engaged in juror misconduct requiring him to be excused from service.

(Id. at 1611:15-24). The parties agreed. (Id. at 1607:3-1608:2, 1610:19,

1611:7-14). Counsel agreed to the Court giving a note to the remaining jurors

stating the Juror had been excused.[6]

   At about 5:30 p.m., the Court excused the Juror from service, the note was

given to the remaining jurors, and they continued their deliberations. About a half

---

[6]      The Court drafted the note and read it to counsel. The note stated:

Ladies and gentlemen, I have reviewed the note that I received from
your foreperson, and I have considered the matters presented in the
note. As a result, I have excused [the Juror] from his duties as a juror,
and your deliberations will continue without his participation. Please
advise the Court Security Officer if you would like to continue your
deliberations this evening or whether you would like to continue them
tomorrow morning.

(Tr. at 1612:11-20). Counsel agreed with the note. (Id.).

15

an hour later, the jury notified the Court that it had reached a verdict.  (Id. at 1619:3-8).

The jury returned to the courtroom, announced they had reached a verdict, and gave their completed Supplemented Verdict Form ([223]) to the Court.  The Court reviewed the completed form, confirmed that it was in the proper form, and instructed the courtroom deputy to publish the verdict.  (Tr. at 1620:20-1621:5).

In its verdict, the jury found by a preponderance of the evidence that Wright Medical's hip replacement device was defectively designed, was unreasonably dangerous, was defective when it was sold to Plaintiff, caused Plaintiff's injuries, and that Plaintiff was entitled to recover compensatory damages on account of the defective device in the amount of $550,000.  ([223] at 1-2).  The jury found that Defendant did not make fraudulent misrepresentations regarding the device, and did not fraudulently conceal important facts regarding the device.  (Id. at 3, 5).  The jury found that Defendant made negligent misrepresentations regarding the device, and awarded Plaintiff an additional $450,000 in compensatory damages for the negligent misrepresentations.  (Id. at 4).

The jury also awarded $10 million in punitive damages, and concluded that Plaintiff was not at fault in causing her harm.  (Id. at 6).  The jury, in the Special Factual Findings section, found that Defendant had failed to prove by a

16

preponderance of the evidence that the hip replacement device, properly manufactured, was accompanied by proper directions and warnings.  (Id. at 7). The poll of the jurors confirmed that the verdict was the verdict each of them reached in the jury room.  (Tr. at 1625:9-1627:22).

On December 2, 2015, judgment was entered in favor of Plaintiff and against Defendant for compensatory damages in the amount of $1,000,000 and punitive damages in the amount of $10,000,000, for a total judgment of $11,000,000.  ([224]).  The Court ordered that post-trial motions be filed on or before December 28, 2015.  On December 28, 2015, Defendant filed its Renewed Motion for Judgment as a Matter of Law, or in the Alternative, Motion for New Trial and to Amend the Judgment.

## II.   LEGAL STANDARDS

### A.   Motion for Judgment as a Matter of Law

Rule 50(a) of the Federal Rules of Civil Procedure provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
> (A) resolve the issue against the party; and
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1).

To grant a motion under Rule 50, the Court must find "'there is no legally sufficient evidentiary basis for a reasonable jury to find' for the non-moving party." Chaney v. City of Orlando, 483 F.3d 1221, 1227 (11th Cir. 2007) (quoting Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001)); see also Burrell v. Okla. Dep't of Transp., 28 F.3d 112 (10th Cir. 1994).

In considering a Rule 50 motion, the Court focuses on the sufficiency of the evidence. Chaney, 483 F.3d at 1227. The Court must "review all of the evidence in the record and must draw all reasonable inferences in favor of the nonmoving party." Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1192-93 (11th Cir. 2004). Credibility determinations, the drawing of inferences, and the weighing of competing evidence are functions for the jury, not the Court. Id. at 1193.

Where the case has been submitted to the jury, the Court must deny the motion and affirm the jury verdict "unless there is no legal basis upon which the jury could have found for [the prevailing party]." See Nebula Glass Int'l, Inc. v. Reichhold, Inc., 454 F.3d 1203, 1210 (11th Cir. 2006).

B.     Motion for New Trial or to Amend a Judgment

A motion under Rule 59(e) may be granted only under certain limited circumstances.  "[T]here are three primary grounds for reconsideration of a judgment: an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice." United States v. Battle, 272 F. Supp. 2d 1354, 1357 (N.D. Ga. 2003).  Whether to grant a Rule 59(e) motion is "committed to the sound discretion of the district judge."  Am. Home Assurance Co. v. Glenn Estess & Assocs., 763 F.2d 1237, 1238-39 (11th Cir. 1985).

Rule 59(a)(1) of the Federal Rules of Civil Procedure provides:

The Court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows:  (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or (B) after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court.

Fed. R. Civ. P. 59(a)(1).  A motion for a new trial generally may be granted where "the verdict is against the weight of the evidence, . . . the damages are excessive, or . . . for other reasons, the trial was not fair to the moving party; [or where there are] questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury."  Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940).

"In general, a remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence." Goldstein v. Manhattan Indus., Inc., 758 F.2d 1435, 1448 (11th Cir. 1985); see also First Sec. Bank of Utah, N.A. v. J.B.J. Feedyards, Inc., 653 P.2d 591, 598 (Utah 1982) ("While the finder of fact has wide latitude in determining damages, th[e] Court has authority to reduce the amount of the trial court's award where all reasonable minds would conclude [that] the limits have been exceeded.") (internal quotations omitted).

## III.   ANALYSIS

Defendant argues it is entitled to judgment as a matter of law because, on the Original Verdict Form, the jury answered "No" to Question 1A, which Defendant claims is a dispositive finding that the hip replacement device was not defectively designed.  (Def's Br. in Supp. of Renewed Mot. [246] at 1-7).  Defendant alternatively argues that it is entitled to a new trial because of (1) juror confusion or bias, and (2) the excusal of the Juror without good cause.  (Id. at 8-16).  If the Court does not grant Defendant judgment as a matter of law based on the verdict reflected on the Original Verdict Form, or order a new trial, Defendant argues it is entitled to judgment as a matter of law or a new trial on Plaintiff's strict liability design defect claim, negligence claim, and negligent misrepresentation claim.  (Id.

at 16-24).  Finally, Defendant argues the Court should strike or reduce the punitive

damages award or order a new trial on punitive damages, and should order a new

trial on compensatory damages unless Plaintiff accepts a remitter.  (Id. at 24-35).

### A.    Judgment as a Matter of Law Based on Original Verdict Form

Defendant argues that when the jury indicated on the Original Verdict Form

that the hip replacement device was not defectively designed, the case was decided

and it was error for the Court to resubmit the matter to the jury based on jury

confusion.  (Br. at 4).  According to Defendant, the "Court should have accepted

the special verdict form and molded the verdict to the dispositive initial

determination.  All subsequent answers in the Original Verdict Form should have

been disregarded as surplusage."  (Id.) (citing Fed. R. Civ. P. 49(a)).

Rule 49 of the Federal Rules of Civil Procedure addresses "general verdicts

with answers to written questions."  Fed. R. Civ. P. 49(b).[7]  Rule 49(b) provides:

---

[7]    Rule 49(a) addresses "special verdicts" and states that a district court "may
require a jury to return only a special verdict in the form of a special written
finding on each issue of fact."  Fed. R. Civ. P. 49(a)(1).  To the extent Defendant
argues that the verdict recorded on the Original Verdict Form was a "special
verdict" under Rule 49(a), the Original Verdict Form required the jury to make
specific factual findings and to apply the law to those findings to reach its verdict.
The Original Verdict Form thus was a "general verdict with answers to written
questions" under Rule 49(b), not a "special verdict" under Rule 49(a).  See, e.g.,
Mason v. Ford Motor Co., 307 F.3d 1271, 1274-75 (11th Cir. 2002) ("When Rule
49(b) is employed, the jury makes specific factual findings, and the jury itself
applies the law to those factual findings to issue a general verdict."); Jarvis v. Ford

> [a district court] may submit to the jury forms for a general verdict, together with written questions on one or more issues of fact that the jury must decide.  The court must give the instructions and explanations necessary to enable the jury to render a general verdict and answer the questions in writing, and must direct the jury to do both.

Fed. R. Civ. P. 49(b)(1).  Rule 49(b) also discusses the options available to a court when the answers required in response to written questions are inconsistent with the verdict or with each other.  Rule 49(b)(4) specifically provides: "[w]hen the answers are inconsistent with each other and one or more is also inconsistent with the general verdict, judgment must not be entered; instead, the court must direct the jury to further consider its answers and verdict, or must order a new trial."  Fed. R. Civ. P. 49(b)(4).

Because the verdict form in this case was a Rule 49(b) general verdict with answers to written questions submitted to the jury, Rule 49(b) authorizes the Court to resubmit the general verdict to the jury if the jury's answers to the written questions were inconsistent.  See Fed. R. Civ. P. 49(b)(1), (4); Mason v. Ford Motor Co., 307 F.3d 1271, 1274 (11th Cir. 2002); Wilbur v. Corr. Servs. Corp., 393 F.3d 1192, 1203 (11th Cir. 2004) (resubmission of inconsistent Rule 49(b) verdict a better alternative).  "A verdict contains an inconsistency if answers given

---

Motor Co., 283 F.3d 33, 56 (2d Cir. 2002); Portage II v. Bryant Petrol. Corp., 899 F.2d 1514, 1521 (6th Cir. 1990).

by the jury may [not] fairly be said to represent a logical and probable decision on the relevant issues as submitted." Wilbur, 393 F.3d at 1200.

The verdict recorded on the Original Verdict Form contained inconsistent answers when the verdict form was completed by the jury. The answers themselves were irreconcilably inconsistent, likely caused by the jury's confusion with the instructions. The Original Verdict Form shows that the jury concluded the hip replacement device was not defective, but failed to recognize the instruction that followed Question 1A, which told them to stop any further deliberations and sign and date the form. (Original Verdict Form at 1). This instruction was intended to mean that the jury was to stop deliberating and sign and date the last page of the form. The foreperson instead signed and dated page one of the form, then proceeded to page 2 and, after answering Question 1D—the second question on page 2—the foreperson, following the instruction that followed Question 1D, stopped answering the remaining questions on page 2 and signed and dated the bottom of page 2. (Id. at 1-2). The jury's consistently incorrect application of the instructions resulted in inconsistent findings. The jury's answers to Questions 1A and 1D are facially inconsistent with its answers to Questions 3A, 3B, 3C, 5A, and 6A, and they do not "represent a logical and probable decision on the relevant issues as submitted." See Wilbur, 393 F.3d at 1200. The failure to properly

interpret the instructions on the form caused a verdict not intended by the Court or the parties because it had embedded inconsistencies.

These inconsistent answers, and the foreperson's signing and dating of pages 1 and 2 of the form that had the "stop, sign and date" instruction, shows the jury simply did not understand the process they were to follow.[8]  That the jury was confused by the Original Verdict Form is confirmed by their response when the Original Verdict Form was resubmitted to them with the Court's direction that they reread the Original Verdict Form—including by reading it aloud—to ensure they understood it.  Shortly after they retired to continue their deliberations, they wrote to the Court saying they did not understand the form and wanted a further explanation of it.  (Tr. at 1525:23-1526:1).  After the Court provided the Supplemented Verdict Form, with its more detailed and unambiguous instructions, the jury reached its unanimous verdict supported by internally consistent answers to the questions on the Supplemented Verdict Form.  (Id. at 1619:3-8, 1620:20-1621:5).

Federal Rule of Civil Procedure 49(b)(4) authorizes a court faced with inconsistent answers to questions on a verdict form to exercise its discretion to

---

[8]     The Original Verdict Form was drafted by lawyers, and to them the instructions were clear.  Ultimately, the instructions are required to be understood and followed by jurors without legal training.

direct the jury to further consider the answers it gave and the verdict reached.  <u>See</u>

Fed. R. Civ. P. 49(b)(4).  That is what the Court did here.  After recognizing the

inconsistencies on the verdict form, it consulted with counsel and decided to

resubmit the matter to the jury for further deliberations with the additional

instructions given.  It was the proper and prudent decision.  <u>See</u> <u>Univ. Computing

Co. v. Lykes-Youngstown Corp.</u>, 504 F.2d 518, 547 (5th Cir. 1974) ("[I]f the jury

returns two inconsistent verdicts, the trial court may resubmit the issue to them for

clarification."); <u>Scott-Harris v. City of Fall River</u>, 134 F.3d 427, 435 (1st Cir.

1997) ("When a verdict appears to be internally inconsistent, the safest course—in

the absence of irreparable damage, and none appears here—is to defer its

acceptance, consult with counsel, give the jury supplemental instructions, and

recommit the matter for further consideration."); <u>Hafner v. Brown</u>, 983 F.2d 570,

575 (4th Cir. 1992) ("If the district judge concludes that an inconsistent verdict

reflects jury confusion or uncertainty, he or she has the duty to clarify the law

governing the case and resubmit the verdict for a jury decision."); <u>Richard

v. Firestone Tire & Rubber Co.</u>, 853 F.2d 1258, 1260 (5th Cir. 1988) ("The district

judge, who has observed the jury during the trial, prepared the questions and

explained them to the jury, is in the best position to determine whether the answers

reflect confusion or uncertainty. The judge also is in an excellent position to

25

evaluate whether the jury will likely be able to resolve this uncertainty with proper guidance.").

The Court concludes that the general verdict recorded in the Original Verdict Form contained inconsistent answers resulting from the jury's confusion over the Original Verdict Form's instructions.  The Court further concludes it properly and prudently exercised its discretion to resubmit the case to the jury.

Even if the verdict recorded in the Original Verdict Form was a "special verdict"—which the Court concludes it was not—resubmission of the verdict to the jury still was the appropriate way to address the jury's inconsistent answers.  Only a minority of circuits have concluded that because Rule 49(a) does not specifically provide for resubmission of the special verdict to the jury in the event of inconsistent answers, resubmission to the jury is not permitted.  Even though Rule 49(a) does not expressly provide for resubmission of inconsistent special verdicts, the preferred interpretation of the rule is to recognize that a court has the authority to resubmit, if resubmission might produce consistent answers upon which the Court can apply the law to reach a final decision in the case.

This is the approach our circuit takes.  The Eleventh Circuit has held that resubmission of a Rule 49(a) special verdict is appropriate where the verdict contains inconsistent answers.  Burger King Corp. v. Mason, 710 F.2d 1480, 1489

(11th Cir. 1983) (Noting that when an "insurmountable inconsistency or ambiguity is perceived [in a special verdict], the trial court may resubmit the issue to the jury before it is dismissed or order a new trial on some or all of the issues."). The Burger King court noted the risk of inconsistency and ambiguity when using a special verdict, and where an acceptable verdict may not have been rendered, "[o]ften the need for a new trial can be avoided by requesting resubmission to the jury." Id. at 1489 n.5.

For the reasons stated above, Defendant is not entitled to judgment as a matter of law on this ground.[9]

---

[9]     Defendant argues that McVey v. Phillips Petrol. Co., 288 F.2d 53 (5th Cir. 1961) supports that the Court should have accepted the jury's original answer of "No" to Question 1A. (Reply [248] at 2). Defendant's reliance on McVey is misplaced. In McVey, the jury was provided a special verdict form in which they were to reach specific findings of fact regarding whether the plaintiff had been injured and, if so, the plaintiff's damages. McVey, 288 F.2d at 58-59. During deliberations, the jury asked the court for clarification on the damages questions. Id. at 59. The court instructed the jury to answer the damages questions regardless of how it answered any other questions. Id. The jury returned a special verdict finding that the defendant was not liable, but specifying the damages suffered by the plaintiff. Id. at 58-59. The Fifth Circuit concluded that the inconsistency was more apparent than real, and that the district court's decision to enter judgment in favor of the defendant was correct. Id. at 59-60. Here, unlike in McVey, the jury was instructed to cease answering questions if it answered "No" to Question 1A. The Court finds that the jury was confused about the instructions it was required to follow when completing the verdict form, and resubmission was the proper way to allow the jury to clarify its answers. The reasoning of McVey does not apply here.

27

B.     New Trial Based on Jury Bias or Confusion and Excusal of the Juror
       Without Good Cause

Defendant argues it is entitled to a new trial because the jury was confused

or biased, and because the Court excused the Juror without good cause.

1.     Jury Bias or Confusion

Defendant claims that the apparent inconsistencies in the verdict recorded on

the Original Verdict Form, and the jury's decision, reflected in the Supplemented

Verdict Form, to increase compensatory damages from $662,500 to $1 million and

punitive damages from $2.5 million to $10 million shows the jury was confused,

and possibly biased.  (Br. at 10).  Defendant argues the jury's confusion and bias

was evidenced by their inability to deliberate effectively, and the jury's change of

its answers to Questions 1A and 1D shows the jury was determined to find

Defendant liable despite its original finding that there was no defect in the hip

replacement device.  (Id. at 12-13).

Defendant argues further the Court added to the jury's confusion and bias by

the way it handled the publishing of the verdict.  (Id.).  Defendant claims that when

the Court accepted the Original Verdict Form from the jury, stated it was properly

completed, and asked the courtroom deputy to read it, only to stop publication after

the answer to Question 1A was read, the Court "signaled to the jury that its answer

to Question 1A was wrong, since that answer triggered the abrupt halt to publication." (Id. at 8-9).

Defendant's argument that the partial reading of the Original Verdict Form created jury bias by signaling that the jury's answer to Question 1A was wrong, is conjecture. When the Court interrupted further reading of the Original Verdict Form, the Court was determined to tell the jury, in neutral terms, the next steps the Court required after it realized the inconsistencies in the form. The Court did so by stating that it wanted to explain the Original Verdict Form before asking the jury "to go back into the jury room and do whatever you think in your considered judgment is necessary for you to reach your verdict." (Tr. at 1521:14-16). The Court explained the form as follows:

> The jury form was created to walk you through findings that you are required to make and findings that you are not supposed to make if you make certain other findings, and that's why all the instructions are in there . . . . [Y]ou have to follow the instructions specifically because they are an essential part of the verdict form and the way that you are supposed to reach your verdict.
>
> . . .
>
> I am going to give you another copy of the form [and I suggest you] just walk through or maybe even read the verdict form outloud [sic] to make sure everybody is listening to the findings that are asked to be made and what the instructions are after each of the findings is made.
>
> . . .

> And then ultimately, having fully understood the form and then fully
> decided and unanimously decided what your verdict -- you want your
> verdict to be, then complete the form and tell the Court Security
> Officer that you have reached your verdict.

(Id. at 1521:19-1522:2, 1522:8-12, 1523:9-13).  Defendant did not object to this

explanation and instruction to the jury.  (Id. at 1525:5-8).[10]

The Court's instructions did not signal to the jury that it must answer "Yes"

to Question 1A, or that the Court considered the jury's answers on the Original

Verdict Form to be incorrect.  The instruction's objective was to reset the process

by which the jury was required to deliberate and reset their use of the Original

Verdict Form.  That the jury, after retiring to the jury room, communicated to the

Court that it did not understand the Original Verdict Form and needed an

additional explanation of it, supports that the jury was simply confused about the

form and what it required.  After the Court reinstructed the jury with the complete

jury charge and after receiving the Supplemented Verdict Form which the Court

and counsel prepared for the jury's use in its continued deliberations, the jury

deliberated for two more days.  This discredits any claim that the jury intended

simply to find Defendant liable for damages.  Had that been its goal, the revised

form would have been completed and returned immediately, not two days later.

---

[10]    The Court acknowledges Defendant previously objected to resubmission of
the case to the jury for further deliberations.

That the deliberations may have been contentious demonstrates the jury was discussing the merits of the case robustly.

Defendant next argues the inconsistencies between the verdicts recorded in the Original Verdict Form and the Supplemented Verdict Form show the jury was confused.  This argument is not persuasive.  It was the internal inconsistencies in the Original Verdict Form that required resubmission, because the inconsistent findings showed the jury was confused.  Resubmission "necessarily means that there might well be a difference between the first verdict and that reached after resubmission."  E.g., Duk v. MGM Grand Hotel, Inc., 320 F.3d 1052, 1059 (9th Cir. 2003).  "Such an 'inconsistency' will usually be considered a proper correction of a mistake in the original verdict."  Id.  Had the jury not changed any of its answers, the Court would have again been presented with an internally inconsistent verdict.

Defendant relies on Riley v. K Mart Corp., 864 F.2d 1049 (3d Cir. 1988), to support that the inconsistencies between the verdicts recorded in the Original Verdict Form and the Supplemented Verdict Form demonstrate the jury's confusion and bias, requiring a new trial.  (Br. at 8).  Defendant's reliance on Riley is misplaced.  Riley was a slip and fall case in which the jury was asked to decide if Kmart and Riley were both negligent in causing the accident.  Riley, 864 F.2d at

31

1050-51.  If the jury concluded that both parties were negligent, the jury was instructed to determine each party's percentage of fault, and the total damages.  Id. The jury was also instructed on Pennsylvania's comparative negligence law, and was told that, if "Riley's negligence was equal to or exceeded that of the defendant, then the plaintiff would not win."  Id. at 1050 (internal quotations omitted).  The jury was not instructed not to answer the damages question if they found Riley's negligence equaled or exceeded Kmart's negligence.  Id. at 1051.

During their deliberations, the jury asked if they were required to determine total damages even if they concluded that both parties were partially responsible. Id.  The district court answered in the note: "Yes.  Your answer to 4 is the *total* amount of damages.  (Of that amount, plaintiff will actually get a judgment in the lesser sum—i.e., your total award, reduced by the percentage of plaintiff's own negligence, if any)."  Id.

The jury found that Kmart was 30% negligent, and Riley was 70% negligent, in causing the accident.  Id.  The jury found that Riley had sustained $250,000 in damages.  Id.  If Pennsylvania had been a "pure" comparative negligence state, Riley would have recovered $75,000 in damages.  Id. at 1051-52. Under Pennsylvania law, however, Riley was not entitled to recover any damages if he was 50% or more responsible for the accident.  Id. at 1051.

32

The jury's finding that Riley was 70% responsible for the accident precluded

Riley from recovering any damages, and the district court sent the jury a note:

> Please clarify your verdict.  As explained in my original instruction
> (but I forgot to include it again in answering your questions), if
> plaintiff's own negligence exceeds that of the defendant (*i.e.,* more
> than 50%), plaintiff loses.  Your verdict assigns 70% negligence to
> plaintiff (*i.e.,* a verdict for *defendant*), but also states the amount of
> damages.  Please clarify.

Id. at 1052.  Within minutes of being reminded of Pennsylvania's rule on

comparative negligence, the jury revised its verdict to reduce Riley's negligence

from 70% to 49.9%, increase Kmart's negligence from 30% to 50.1%, and lower

the total damages from $250,000 to $150,000.  Id. at 1052, 1054.  The district court

then entered judgment against Kmart, awarding Riley damages in the amount of

$75,150.  Id. at 1052.

The Third Circuit found that the district court's decision to resubmit the

verdict to the jury for clarification was proper because the court's instructions

when it answered the jury's damages question created jury confusion over the

apportionment of fault and damages.  Id. at 1052-53.  The Third Circuit concluded,

however, that the district court erred when it accepted the second set of responses

because they were totally inconsistent with the original answers.  Id. at 1054.  The

Riley court noted the only consistency between the original verdict and the

replacement verdict was that the jury sought to award Riley $75,000 in damages,

and found that the jury, upon resubmission, revised their finding of fault and the total damages to make a $75,000 damage award.  Id.  The Third Circuit held there was "no principled reconciliation of such blatant inconsistencies," finding this was not one where the "jury rendered inconsistent answers which are explicable in light of the complexity or multiplicity of the questions asked of it."  Id. at 1054-55.  In view of the jury's outcome-determinative verdict changes, the Third Circuit vacated the judgment and remanded the case for a new trial.  Id. at 1054-55.

Riley does not apply here.  The original verdict in Riley was not internally inconsistent—the verdict sought answers to specific factual questions, and the court did not instruct the jury to refrain from assessing the amount of damages even if they also concluded that Riley was more than 50% responsible for the accident.  Id. at 1052 ("[T]he jury's first answers could be viewed as consistent, by reading them as saying that Riley suffered $250,000 in damages from the fall but that [Kmart] was only 30% responsible and therefore not under a legal duty to compensate Riley . . . .").  The Original Verdict Form in this case instructed the jury to cease its deliberations if it concluded that the hip replacement device did not have a design defect.  The Original Verdict Form completed by the jury had obvious internal inconsistencies, including because the answers to Questions 1A and 1D were inconsistent with the jury's finding of liability for negligent

34

misrepresentation, and the award of compensatory and punitive damages based on the misrepresentations.  The inconsistencies in the Original Verdict Form can be explained by the "complexity or multiplicity of the questions asked of [the jury]," as evidenced by the fact the Original Verdict Form was seven pages and the possibility the jury would have to answer twenty-four questions as it worked through a serious of questions and instructions depending upon the answers given. See id. at 1054; (Original Verdict Form at 1-7).  As the Court already noted, the stop, sign and date instruction obviously was misunderstood by the jury, leading to the internal inconsistencies in their findings—inconsistencies that likely were not facially apparent to the jury even when the form was completed.

Unlike in Riley, the jury here did not return a verdict minutes later by simply changing its answers to conform to a predetermined desired outcome.  The jury requested additional clarification on the Original Verdict Form's instructions, stating they did not understand the form.  After being provided the Supplemented Verdict Form with its elaborated instructions and, after the Court repeated its entire charge, the jury deliberated for two additional days before it reached the verdict recorded in the Supplemented Verdict Form.  (Tr. at 1563:24-1564:21, 1619:3-8). When it did, the award of damages to Plaintiff, while changing in amount, did not change the jury's decision, apparent even in the Original Verdict Form, that

Plaintiff had been damaged and that Defendant's conduct supported an award of punitive damages.  That is, there is nothing in the jury's continued deliberations to suggest that the jury simply sought to find Defendant liable regardless of the burden of proof Plaintiff was required to meet.  In fact, the jury notified the Court during its continuing deliberations they were unable to reach a unanimous verdict.  (Id. at 1574:8-10).  The Court instructed them to continue deliberating.  The next day, the Court received a further note from one of the jurors that stated the deliberations were taking an "extensively long time as one of the jurors doesn't look at the evidence through the perspective of the law . . . ."  (Id. at 1583:8-1584:9).  This discredits entirely Defendant's claim that the jury did not accept its duty to responsibly apply the law to the facts to reach a unanimous decision.  All indications are the jury did not have a predetermined outcome but responsibly deliberated on a verdict and finally recorded it correctly on the Supplemented Verdict Form given to them.[11]

---

[11]    To the extent Defendant relies on Nissho-Iwai Co. v. Occidental Crude Sales, 729 F.2d 1530, (5th Cir. 1984), Weingart v. Allen & O'Hara, Inc., 654 F.2d 1096 (5th Cir. 1981), Lavin v. Tony Depaul & Son, No. 93-1502, 1995 WL 765720, at *1 (E.D. Pa. Dec. 29, 1995), and Rattray v. Woodbury Cty., Iowa, 788 F. Supp. 2d 839 (N.D. Iowa 2011), these cases do not support that the Court must grant a new trial.  In Nissho-Iwai, the Fifth Circuit merely affirmed the district court's discretionary decision to order a new trial based on juror confusion—the Fifth Circuit did not find that a new trial was "required."  It simply stated it was allowed.  Nissho-Iwai, 729 F.2d at 1538.  The Weingart court also

The jury's apparent confusion over the instructions on the Original Verdict

Form, their response that they did not understand the form, and that they required

two additional days to deliberate after the Court expanded the verdict form to

---

affirmed the district court's decision to order a new trial based on the jury's inconsistent answers on special interrogatories regarding damages. Weingart, 654 F.2d at 1105-06. The Weingart court did not hold that a district court must always grant a new trial when a jury's verdict is inconsistent. Ordering a new trial is one, among several, options available to a district court when presented with inconsistent answers to written questions. A court may, in its discretion, order a new trial or choose some other process, including resubmission. See Fed. R. Civ. P. 49(b)(4); Wilbur, 393 F.3d at 1203.

   In Lavin, the district court asked the jury to clarify its finding of no liability, when the jury, disregarding the instruction to stop answering questions on the verdict form if they found there to be no liability, instead went on to find the plaintiff was entitled to damages. Lavin, 1995 WL 765720, at *2. Regarding the court's clarification request, the jury stated that it had not read the instructions following the liability question—which required them to not answer the questions regarding damages if they found no liability—and told the court they wanted to change their answer to the liability question to find liability. Id. The district court concluded the jury sought to change its answer to the liability question so it could award damages. Id. at *3-5. The court did not accept the verdict, instead ordering a new trial. Id. In Rattray, the court ordered a new trial when the jury, after resubmission, learned it could not award $250,000 in nominal damages as it did in its first verdict. Rattray, 788 F. Supp. 2d at 842-46. The jury returned a second verdict minutes later awarding $250,000 in compensatory damages. Id. The Rattray court stated the jury did not, at any point, indicate it was confused by the court's instructions. Id. at 846. The court thus concluded that the jury wanted to award the plaintiff $250,000 in damages in any way that it could. Id. Here, unlike in Lavin and Rattray, the evidence does not support—in fact it contradicts—that the jury simply wanted to find Defendant liable and award sizable damages. After indicating that it did not understand the verdict form instructions, the jury was given the Supplemented Verdict Form, reinstructed on the law, and deliberated for two additional days before reaching its verdict. Defendant's argument that the jury simply wanted to find it liable is unsupported by the record, and Lavin and Rattray do not apply.

provide more specific instructions, demonstrates that the verdict was the result of unbiased deliberations by a jury that was no longer confused about the meaning of the instructions it was required to follow.

Defendant has not shown that the jury's verdict was the result of confusion or bias, or that the different answers between the verdicts recorded on the Supplemented Verdict Form and the Original Verdict Form require the Court to reject the verdict.  Defendant is not entitled to a new trial on this ground.

### 2.     Excusal of Juror

Defendant moves for a new trial on the grounds that the Court dismissed the Juror without good cause, and his dismissal prejudiced and confused the jury.  (Br. at 13).  Defendant claims the Juror disagreed with his fellow jurors based on a different "view of the evidence," and that the Court should not have questioned the Juror on his understanding of the instructions in the verdict form.  (Id. at 14-15).[12]

"During trial or deliberation, the court may excuse a juror for good cause." Fed. R. Civ. P. 47(c).  Under Rule 47(c),

> the court may in appropriate circumstances excuse a juror during the
> jury deliberations without causing a mistrial.  Sickness, family

---

[12]     According to Defendant, the Court should have "adopted a less severe approach than seeking to dismiss him, and used other methods to maintain the composition of the jury," such as instructing the Juror about the need to follow the Court's instructions, reminding the jury about the need to deliberate, or giving an Allen charge.  (Br. at 15).

emergency or juror misconduct that might occasion a mistrial are examples of appropriate grounds for excusing a juror. It is not grounds for the dismissal of a juror that the juror refuses to join with fellow jurors in reaching a unanimous verdict.

Fed. R. Civ. P. 47(c) advisory committee's note to 1991 amendment. This list is not exhaustive. See Interpool Ltd. v. Patterson, 874 F. Supp. 616, 618 (S.D.N.Y. 1995). "The decision to remove a juror is generally entrusted to the sound discretion of the trial judge whenever facts are presented which convince the trial judge that the juror's ability to perform [his] duty as a juror is impaired." United States v. Davis, 708 F.3d 1216, 1222-23 (11th Cir. 2013).[13]

A trial court, after deliberations have begun, is entitled to investigate whether good cause exists to dismiss a juror. See United States v. Thomas, 116 F.3d 606, 620 (2d Cir. 1997). "Whether and to what extent a juror should be questioned regarding the circumstances of a need to be excused is [] within the trial judge's sound discretion." United States v. Reese, 33 F.3d 166, 173 (2d Cir. 1994).

---

[13] Most cases that discuss dismissal of a deliberating juror concern dismissal under Rule 23(b)(3) of the Federal Rules of Criminal Procedure, which permits a court to dismiss a deliberating juror if the court finds "good cause" to excuse him. Fed. R. Crim. P. 23(b)(3). The standards for dismissal under Rule 23(b) of the Federal Rules of Criminal Procedure and Rule 47(c) of the Federal Rules of Civil Procedure are similar and, in evaluating whether good cause exists in civil cases, the Eleventh Circuit considers the Rule 23(b) standard applied in criminal cases. See, e.g., Dix v. United Parcel Serv., Inc., 279 F. App'x 816, 817 (11th Cir. 2008).

On November 24, 2015, the Court received two notes from the jury referring to a juror's participation in deliberations.  The first note, from a juror with personal obligations that were being interfered with due to the length of the trial, stated that the deliberations were taking an "extensively long time as one of the jurors doesn't look at the evidence through the perspective of the law . . . ."  (Tr. at 1583:8-1584:9).  The second note, this one from the foreperson, stated: "We are unable to provide a verdict and complete the verdict form.  We have one juror that has decided no longer to participate in the jury and the process to reach a unanimous verdict."  (Id. at 1586:3-7).

The Court disclosed these notes to counsel for the parties.  Because the nature of the conduct referred to in the notes was not clear, the Court discussed with counsel whether it was appropriate to determine which of the jurors was referenced in the notes and ask the juror about his or her participation in the deliberations.  (Id. at 1588:11-16).  Counsel agreed with the Court's suggestion to ask the foreperson to identify the subject of the notes and they agreed that the Court should ask that juror about his or her participation.  (Id.).  The Court told the parties that counsel would be present at this discussion.  (Id. at 1593:4-7).  The foreperson identified the Juror, who was referred to in both notes, and the Court, in the presence of counsel for the parties, spoke with the Juror in chambers.

The Court, during the initial round of questions, asked the Juror, among other things, the following:

> Let's say there is a question and you deliberated on that, and you say no, I agree with that, and they checked that box, and then there is an instruction that said if you answer the question a certain way, then you have to do this, or if you answer this way, then you do this.
>
> Is there one of those instructions that you can say—it says I have to do that, but I'm not willing to do that?

(Id. at 1606:6-13).  The Juror responded: "Yes.  Yes."  (Id. at 1606:14).  The Juror was then excused from chambers.

After the Juror left chambers, the Court stated the following to counsel for the parties:

> I think his statement that he cannot follow an instruction on the jury form is a problem, and it was pretty specific that if he agreed with a decision and they checked it, but then couldn't follow an instruction— we have had a long discussion about the instructions, I believe, and I believe we agreed on it, and even since it's elaborated on, I think it's more clear that those instructions are legally required.
>
> And I think he's saying that there is just one that he—that leads him to a conclusion that he can't agree with, and therefore he's not—he can't follow the instruction.
>
> And if you can't—he has to follow the law as he's instructed, which would include the jury form.  And somebody who doesn't—isn't willing to follow the instructions that I give to them, including on the jury form, that's good cause to excuse him.

(Id. at 1607:3-19).

Counsel for Defendant stated:

> The only—I agree with that.  The only question I had, because I think Your Honor was right in hearing the same thing that I thought he was saying, it wasn't clear to me if he was talking about he was the one unable to follow the instructions or he thinks he is and everyone else isn't.

(Id. at 1607:22-1608:2).  The Court agreed to Defendant's request to clarify that the Juror was the member of the jury unable to follow the instructions.  The Juror was recalled to chambers and questioned again about his deliberation participation.

The follow-up questioning was as follows:

> THE COURT: So I don't want to focus on any specific question, but has there been during your deliberations a question where you have voted with the others on how to answer the question—have there been times when you agreed with the answer to the question?  Has that happened?
>
> JUROR: Yes, it has.
>
> THE COURT: And then when you go down and look at the instruction, is the answer to that question an instruction that you disagree with and that you haven't been able to follow?
>
> JUROR: Haven't been able to follow?  In some instance, yes.
>
> THE COURT: And is that because you disagree that the instruction would lead to a result that you think should happen?
>
> JUROR: My answer is different from what some of the others had, yes.
>
> THE COURT: And when you say your answer—you answered differently, there are others that say here is what the instruction says,

42

> this is what we have to do, is it your position is I know that's what the instruction says, but I can't agree with it because I think that would lead to the wrong result?
>
> JUROR: Yes, sir.

(Id. at 1609:11-1610:10).  After the Juror left chambers, the Court stated: "I think that clarifies that he is unable to follow the instructions on the verdict form.  Do you agree?"  (Id. at 1610:16-18).  Defendant's counsel replied: "Yes, sir."  (Id. at 1610:19).  Counsel for Defendant agreed that the Juror should be excused for cause.  (Id. at 1607:3-1608:2, 1610:19).

Despite defense counsel's agreement that the Juror should be excused,[14] Defendant now characterizes the Juror's responses to the Court's questions as the Juror disagreeing with the other jurors based on his view of the evidence.  (Br. at 14).  Defendant claims now that the Juror:

> [E]ssentially answered yes when asked if he "disagree[d] with the conclusion and verdicts that others want to reach, and that makes you not want to deliberate any further because you reached a conclusion that is different from the rest?"  ([Tr.] at 1602:21-24)

---

[14]      To the extent Defendant contends that it did not agree that good cause to dismiss the Juror existed, and only agreed "with some general statements of the law" (Reply at 7), Defendant mischaracterizes its counsel's statements.  The Court directly stated, in its initial round of questioning, that it believed the Juror was unable to follow the Court's directions, and that his inability to follow the Court's instructions was good cause to dismiss him.  (Tr. at 1607:3-19).  Counsel for Defendant unequivocally stated: "I agree with that."  (Id. at 1607:22).  Counsel for Defendant agreed that the Juror was unable to follow the Court's directions, and agreed that good cause to excuse him existed.

. . .

[S]tated that disagreement with a principle of law was "not the whole
of it.  It's part of what we have got on the table up there."  (Id. at
1603:17-24)

. . .

[R]esponded that the jurors were shouting at him, in response to the
Court's question, "Is it that whatever different views people have, that
you have a view that's different than theirs, and as a result of that you
are not going to persuade them and they are not going to persuade
you?"  (Id. at 1604:5-10)

. . .

[S]tated that he "differ[ed] from, you know, something that they pose
and tried to go into it myself, they tell me that I shouldn't use that, I
can't use that, that's not included in it.  And I'm like, well, how am I
supposed to make a decision if I can't, you know, express myself."
(Id. at 1604:19-24).

(Br. at 14-15).  These carefully selected responses of the Juror do not accurately

describe the Juror's responses and his statements—as Defendant's counsel at the

in-chambers discussion agreed—that he could not follow the Court's instructions.

Even out of context, as Defendant presents them, these record citations do not

support that the disagreement was based on differing views of the evidence.  The

record is that early in the discussion, the Juror acknowledged that a "principle of

law," while "not the whole of it," influenced his deliberation participation.  This

statement, along with his other responses to the Court, show that his disagreement

with his fellow jurors was not based on a disagreement over the merits of the case,

but centered on his refusal to follow the Court's instructions, a conclusion with which Defendant's counsel agreed before the Juror was excused.[15]

The record supports that there was reason to dismiss the Juror for his misconduct in refusing to follow the Court's instructions. The Juror's responses to the Court's questions during the in-chambers discussion established clearly that he was unable to follow the instructions of the Court. The Juror was asked whether his "position [was] I know that's what the instruction says, but I can't agree with it because I think that would lead to the wrong result?" (Tr. at 1610:6-9). The Juror responded: "Yes, sir." (Id. at 1610:10). The Juror's refusal to follow the Court's instructions as contained on the Supplemented Verdict Form, constituted good—if not compelling—cause to dismiss him from the jury. E.g., Fed. R. Civ. P. 47(c); United States v. Godwin, 765 F.3d 1306, 1316 (11th Cir. 2014) ("Once deliberations have begun, a district court may excuse a juror for good cause, which

---

[15] Even if there was a question about the grounds for the dismissal—and there is not—Defendant waived any objection when it failed to object to the Juror's dismissal, and instead agreed that the Juror's responses required dismissal and agreed that the Juror be dismissed. See, e.g., Fed. R. Civ. P. 46; Ohio Nat'l Life Assur. Corp. v. Langkau ex rel. Estate of Langkau, 353 F. App'x 244, 247 (11th Cir. 2009) ("issues not raised before the district court generally will not be considered"); Trs. of Sabine Area Carpenter's Health & Welfare Fund v. Don Lightfoot Home Builder, Inc., 704 F.2d 822, 828 (5th Cir. 1983) ("a party who fails to object to trial court errors waives the right to complain of them").

includes that juror's refusal to apply the law or to follow the court's instructions.").

Defendant is not entitled to a new trial on this ground.[16]

    C.    <u>Substantive Claims and Defense</u>

        1.    <u>Comment k Defense</u>

Defendant next argues it is entitled to judgment as a matter of law or, in the alternative, a new trial, on Plaintiff's strict liability design defect claim because Comment k to Section 402A of the Restatement (Second) of Torts exempts Defendant from a strict liability claim for design defect.  (Br. at 16).

---

[16]    Defendant notes that the jury reached its verdict soon after the Juror was dismissed, this time finding a design defect in the hip replacement device.  (Br. at 16).  Defendant argues—without support—that the Juror may have disagreed with the determination that the device was defective and the remaining jurors "could have viewed his dismissal as an affirmation from the Court that they were supposed to enter an award against [Defendant]."  (<u>Id.</u>).  Defendant does not, and cannot, show that the Juror's disagreement pertained to the jury's ultimate finding that there was a design defect.  Indeed, the record shows only that the Juror declined to follow the Court's instructions.

    When the Juror was dismissed, the Court proposed a neutral instruction to be given to the remaining jurors to explain the dismissal, including that it was related to the note sent by the foreperson advising the Court of one juror's problems with following the law.  The Court suggested stating, in a note to the jury: "I have reviewed the note that I received from your foreperson, and I have considered the matters presented in the note.  As a result, I have excused [the Juror] from his duties as a juror, and your deliberations will continue without his participation.  Please advise the Court Security Officer if you would like to continue your deliberations this evening or whether you would like to continue them tomorrow morning."  (Tr. at 1612:12-20).  Defendant did not object to this note and did not suggest it prejudiced Defendant.  (<u>Id.</u> at 1612:23).  Defendant thus waived any objection on these grounds.  <u>See</u>, <u>e.g.</u>, Fed. R. Civ. P. 46.

Section 402A of the Restatement (Second) of Torts addresses the special
liability that applies to sellers of products that cause physical harm to consumers.
Section 402A states:

> (1) One who sells any product in a defective condition unreasonably
> dangerous to the user or consumer or to his property is subject to
> liability for physical harm thereby caused to the ultimate user or
> consumer, or to his property, if (a) the seller is engaged in the
> business of selling such a product, and (b) it is expected to and does
> reach the user or consumer without substantial change in the condition
> in which it is sold.  (2) The rule stated in Subsection (1) applies
> although (a) the seller has exercised all possible care in the
> preparation and sale of his product, and (b) the user or consumer has
> not bought the product from or entered into any contractual relation
> with the seller.

Restatement (Second) of Torts § 402A (1965).  Comment k provides that
manufacturers of certain specific products can be held strictly liable only under
certain circumstances.  "Comment k serves as an affirmative defense when the
product is incapable of being made safe under present technology, but the social
need for the product warrants its production."  Tansy v. Dacomed Corp., 890 P.2d
881, 885 (Okla. 1994).  Comment k provides:

> There are some products which, in the present state of human
> knowledge, are quite incapable of being made safe for their intended
> and ordinary use.  These are especially common in the field of drugs.
> An outstanding example is the vaccine for the Pasteur treatment of
> rabies, which not uncommonly leads to very serious and damaging
> consequences when it is injected.  Since the disease itself invariably
> leads to a dreadful death, both the marketing and the use of the
> vaccine are fully justified, notwithstanding the unavoidable high

47

degree of risk which they involve.  <u>Such a product, properly prepared,
and accompanied by proper directions and warning</u>, is not defective,
nor is it unreasonably dangerous.  The same is true of many other
drugs, vaccines, and the like, many of which for this very reason
cannot legally be sold except to physicians, or under the prescription
of a physician.  It is also true in particular of many new or
experimental drugs as to which, because of lack of time and
opportunity for sufficient medical experience, there can be no
assurance of safety, or perhaps even of purity of ingredients, but such
experience as there is justifies the marketing and use of the drug
notwithstanding a medically recognizable risk.  The seller of such
products, again with the qualification that they are <u>properly prepared
and marketed, and proper warning is given</u>, where the situation calls
for it, is not to be held to strict liability for unfortunate consequences
attending their use, merely because he has undertaken to supply the
public with an apparently useful and desirable product, attended with
a known but apparently reasonable risk.

Restatement (Second) of Torts § 402A, Comment k (1965) (emphasis added).

In its August 31, 2015, Order, the Court concluded that Comment k applied

to prescribed medical devices that are implanted in the human body.

(August 31, 2015, Order, at 99-100).[17]  The Court further concluded that for

---

[17]      In Creech v. Stryker Corp., No. 2:07CV22 DAK, 2012 WL 33360 (D. Utah
Jan. 6, 2012), the United States District Court for the District of Utah discussed
product defect claims and Section 402A.  This discussion was limited to a short
footnote which states, in its entirety:

> Despite Stryker's argument to the contrary, comment K offers no
> protection to Stryker.  In Grundberg v. Upjohn Co., the Utah Supreme
> Court ruled that comment K [ ] provided protection to prescription
> drug manufacturers.  The court limited this ruling to design defect
> claims against prescription drug manufacturers.  Utah law does not
> preclude strict liability design defect claims against medical product
> manufacturers.

Creech, at *5 n.6 (citing Grundberg v. Upjohn Co., 813 P.2d 89 (Utah 1991))
(internal citations omitted).

The Creech court's interpretation of Grundberg overreaches.  In Grundberg,
the Utah Supreme Court engages in a lengthy discussion of how other state courts
interpret and apply Comment k.  Within this discussion are two important
observations regarding the scope of Comment k, both of which are based on an
American Law Institute ("ALI") annotation.  The first is that, "[e]ven in the case of
a clearly alleged design defect, however, comment k is unclear on the scope of its
protection."  Grundberg, 813 P.2d at 92.  More telling is the Utah Supreme Court's
view of Comment k, after its lengthy discussion of state law applications of
Comment k in prescription drug product liability cases, in which it again referred
to the ALI annotation:

> The American Law Institute's restatements are drafted by legal
> scholars who attempt to summarize the state of the law in a given
> area, predict how the law is changing, and suggest the direction the
> law should take.  The restatement serves an appropriate advisory role
> to courts in approaching unsettled areas of law.  We emphasize,

Comment k to apply, a device design "must be as safe as the best available testing

and research permits," and must be "properly prepared and marketed, and [that]

proper warning is given . . . ."  (Id. at 101) (emphasis added) (citing Restatement

(Second) of Torts § 402A, Comment k (1965)).

---

however, that section 402A of the Restatement (Second) of Torts, as
drafted in 1965, is not binding on our decision in this case except
insofar as we explicitly adopt its various doctrinal principles.  We
agree with the principle comment k embodies, that manufacturers of
unavoidably dangerous products should not be liable for a claim of
design defect.  We are persuaded that all prescription drugs should be
classified as unavoidably dangerous in design because of their unique
nature and value, the elaborate regulatory system overseen by the
FDA, the difficulties of relying on individual lawsuits as a forum in
which to review a prescription drug's design, and the significant
public policy considerations noted in Brown.  We therefore reach the
same conclusion as did the California Supreme Court in Brown, albeit
pursuant to a slightly different rationale.

Id. at 95 (emphasis added).  The Creech court's footnote regarding Comment k is
inconsistent with the Utah Supreme Court's holding in Grundberg and, to the
extent it concludes that, in Utah, Comment k has been found not to apply to
medical devices, the Creech decision misinterprets Grundberg.

    In its August 31, 2015, Order, the Court reached a conclusion consistent
with the Utah Supreme Court's decision in Grundberg, and further noted that most
courts that had considered the issue have concluded that Comment k applies to
medical devices, especially for devices that are implanted in the human body.
(August 31, 2015, Order, at 100).  The Court concludes again that Utah state
courts, when presented with the issue, will conclude that Comment k applies to
prescribed medical devices.

The Utah Model Jury Instructions (the "Pattern Instructions") for Comment k state:

> In response to [name of plaintiff]'s claim that the [product] was defective in design, [name of defendant] claims that the [product] was unavoidably unsafe and that it is therefore not at fault. Some products cannot be made safe for their intended use, but their benefits are great enough to justify their risks of harm. The rabies vaccination is an example, since a few recipients will suffer serious side effects, but the result of not receiving the vaccination is death.
>
> To establish the defense that the [product] was unavoidably unsafe, [name of defendant] must prove that:
>
> (1) when the [product] was made, it could not be made safe for its intended use even applying the best available testing and research; and (2) the benefits of the [product] justified its risk.
>
> If [name of defendant] proves both by a preponderance of the evidence, the [product] is not defective.
>
> This defense does not apply to [name of plaintiff]'s claims that the [product] was improperly manufactured or had inadequate warnings.

Utah Model Jury Instruction CV 1051 (citing Grundberg v. Upjohn Co., 813 P.2d 89 (Utah 1991); Restatement (Second) of Torts § 402A, Comment k (1965)).

At the Charge Conference, the Court stated that the jury charges concerning Comment k needed to include a third element. The parties agreed that Defendant, to establish that Comment k applied, needed to prove that: (1) when the hip replacement device was made, it could not be made safe for its intended use even applying the best available testing and research; and (2) the benefit of the hip

replacement device justified its risk.  The third element the Court determined was

necessary to be added, based on the language of Comment k, was that the hip

replacement device, "properly manufactured, was accompanied by proper

directions and warnings." (Tr. at 1414:11-14).  Defendant objected, arguing

(i) that there had not been any contention that the warnings accompanying the hip

replacement device were improper, and (ii) that the Utah pattern instruction only

included the first two elements.  (Id. at 1415:24-1416:2, 1418:1-3).

The Court noted that the law on Comment k in Utah was not fully mature,

and that, having read the Utah pattern instructions and Comment k, it appeared to

the Court that "using the pattern instruction in this case would be error" and the

third element needed to be included in the jury charges and the instructions.  (Id. at

1414:6-14, 1414:25-1415:23).  The Court concluded that it was Defendant's

obligation to establish that its warnings were proper to show it was entitled to the

Comment k defense, and the Court overruled Defendant's objection to the third

required finding.  (Id. at 1416:3-4, 1418:10-11).

The Court charged the jury regarding Comment k, stating:

Wright Medical has asserted in this case a defense that the hip
replacement device was unavoidably unsafe and thus was not
defective.  To prove this defense, Wright Medical must prove by a
preponderance of the evidence the following.

First, when the hip replacement device was made, it could not be
made safe for its intended purpose even applying the best available
testing and research.

Second, that the benefit of the hip replacement device justified its risk.

And, third, that the device, properly manufactured, was accompanied
by proper directions and warnings.

If Wright Medical proves . . . these elements by a preponderance of
the evidence . . . the hip replacement device is not defective.

(Id. at 1489:6-22).

Question 1C in the Original Verdict Form and the Supplemented Verdict

Form addressed Comment k.  Question 1C asked:

1C.    Do you find by a preponderance of the evidence that when
Wright Medical made the hip replacement device, it could not be
made safe for its intended use even applying the best available testing
and research, and that the benefit of the hip replacement device
justified its risk?

Yes _____        No _____

(Original Verdict Form at 2; Supplemented Verdict Form at 2).  The parties agreed

that if the jury answered "Yes" to Question 1C, it would mean that Comment k

applied and Defendant would prevail on Plaintiff's strict liability claim.  (Tr. at

1421:11-19).

Because Defendant objected to the inclusion of the third element in the

charge, the Court included in the Original Verdict Form and the Supplemented

Verdict Form, a Special Factual Findings section which stated:

> The Court requests that you make special factual findings regarding your answer in response to Question 1C.  If you answered "NO" to Question 1C, please indicate below which facts Wright Medical failed to prove by a preponderance of the evidence.
>
> [**check all that apply**]
>
> \_\_\_\_\_ When the hip replacement device was made, it could not be made safe for its intended use even applying the best available testing and research.
>
> \_\_\_\_\_ The benefit of the hip replacement device justified its risk.
>
> \_\_\_\_\_ The hip replacement device, properly manufactured, was accompanied by proper directions and warnings.

(Original Verdict Form at 7; Supplemented Verdict Form at 7).  If the jury answered "No" to Question 1C, the jury's answers to the Special Factual Findings would indicate to the parties and the Court which element or elements the jury concluded Defendant failed to prove by a preponderance of the evidence.  If the jury concluded that Defendant failed to prove the first or second element, Defendant's objection to the inclusion of the third element would be moot.  If the jury concluded that Defendant failed to prove only the third element, Defendant would be able to appeal the Court's decision to include that element as part of its charges to the jury.

The jury, in its verdict, answered "No" to Question 1C, finding that Defendant had failed to prove that when it "made the hip replacement device, it could not be made safe for its intended use even applying the best available testing and research, and that the benefit of the hip replacement device justified its risk." ([223] at 2). In its special factual findings, the jury concluded that Defendant had failed to prove only the third element—that the hip replacement device, "properly manufactured, was accompanied by proper directions and warnings." (Id. at 7).

Defendant, now with the benefit of the jury's findings, argues that it is entitled to judgment based on Comment k because the warnings element does not apply and the jury found only that element was not proved by Defendant. Defendant argues that to prove that Comment k applied, it only was required to prove by a preponderance of the evidence that "when the hip replacement device was made, it could not be made safe for its intended use even applying the best available testing and research," and that the "benefit of the hip replacement device justified its risk." (Br. at 16-17). Defendant argues the inclusion of the adequacy of warning element was error, and is not supported by Utah law. (Id. at 18-20). Defendant alternatively argues that it is entitled to a new trial because of the Court's misstatement of the law in its jury charge and on the verdict form. (Id.).

Comment k concerns products "which, in the present state of human

55

knowledge, are quite incapable of being made safe for their intended and ordinary use."  Restatement (Second) of Torts § 402A, Comment k (1965).  Comment k states: "[s]uch a product, <u>properly prepared, and accompanied by proper directions and warning</u>, is not defective, nor is it unreasonably dangerous."  <u>Id.</u> (emphasis added).  These products are "especially common in the field of drugs" and, regarding the sale of new and experimental prescription drugs, Comment k states that, "because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety . . . ."  <u>Id.</u>  The comment goes on: "The seller of such products, <u>again with the qualification that they are properly prepared and marketed, and proper warning is given</u>, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use . . . ."  <u>Id.</u> (emphasis added).

In <u>Grundberg</u>, the Utah Supreme Court discussed the application and proof needed to perfect a Comment k defense.  The Utah Supreme Court opined:

> We agree with comment k's basic proposition-that there are some products that have dangers associated with their use even though they are used as intended.  We also agree that the seller of such products, when the products are properly prepared and marketed and distributed with appropriate warnings, should not be held strictly liable for the "unfortunate consequences" attending their use. Thus, we adopt comment k's basic policy as the law to be applied in this state and must now turn to the issue of how to apply that policy.

<u>Grundberg</u>, 813 P.2d at 92.

56

The <u>Grundberg</u> court continued:

> As a condition to its application, comment k requires that the product be "properly prepared, and accompanied by proper directions and warning . . . ."  By its terms, comment k excepts unavoidably unsafe products from strict liability only to the extent that the plaintiff alleges a design defect; comment k's immunity from strict liability does not extend to strict liability claims based on a manufacturing flaw or an inadequate warning . . . .  If, however, such products are mismanufactured or unaccompanied by adequate warnings, the seller may be liable even if the plaintiff cannot establish the seller's negligence.  Both parties agree in this case that the prerequisite to a comment k exemption—that the drug "was properly prepared and accompanied by warnings of its dangerous propensities"—must be established on a case-by-case basis.  This limitation on the scope of comment k immunity is universally recognized.

<u>Id.</u>

Defendant relies on the statement in <u>Grundberg</u> that "[b]y its terms, comment k excepts unavoidably unsafe products from strict liability only to the extent that the plaintiff alleges a design defect; comment k's immunity from strict liability does not extend to strict liability claims based on a manufacturing flaw or an inadequate warning."  <u>Id.</u>  Although this statement correctly describes the scope of Comment k, it does not address what elements must be proved for it to apply to a strict liability design defect case.  The language quoted by Defendant provides only that a Comment k defense is not a defense to strict liability claims based on products not properly manufactured or for which adequate warnings are not given. That is, the defense applies only to design defect strict liability claims, provided

the elements of Comment k are met.[18]

The <u>Grundberg</u> court specifically held that "[a]s a condition to its application, comment k requires that the product be 'properly prepared, and <u>accompanied by proper directions and warning</u> . . . .'" <u>Id.</u> (emphasis added).  In discussing the purpose and scope of Comment k, the <u>Grundberg</u> court stated: "[t]he purpose of comment k is to protect from strict liability products that cannot be designed more safely." <u>Id.</u>  The <u>Grundberg</u> court simply said that Comment k does not provide a defense to strict liability claims based on improper manufacturing or inadequate warnings.  Defendant's reliance on the opinion for the proposition that adequate warnings are not required as an element of proof for the Comment k defense to apply to a design defect claim is misplaced.  Indeed, Comment k is intended to foreclose design defect claims, provided doctors and patients are warned of the risks associated with them.

The language of Comment k and the Utah Supreme Court's interpretation of it in <u>Grundberg</u> support that Comment k requires a defendant to prove that the product at issue was "properly prepared, and accompanied by proper directions and

---

[18]     That the Court dismissed Plaintiff's failure to warn claim on summary judgment does not affect the independent issue regarding what must be proved for Defendant to perfect a Comment k defense.

warning . . . ."  See Restatement (Second) of Torts § 402A, Comment k (1965);

Grundberg, 813 P.2d at 92.[19]

That adequate warnings must be given is well-recognized.  For example,

Georgia courts, applying Comment k to design defect claims, have noted:

> [O]nce a prima facie case for design defect is established . . . a
> pharmaceutical manufacturer will be relieved from strict liability only
> when it demonstrates that it has met the requirements of Comment k,
> that is, when it demonstrates that (1) the product is properly
> manufactured and contains adequate warnings, (2) its benefits justify
> its risks, and (3) the product was at the time of manufacture and
> distribution incapable of being made more safe.

Bryant v. Hoffmann-La Roche, Inc., 585 S.E.2d 723, 728 (Ga. Ct. App. 2003)

(emphasis added); see also Frazier v. Mylan Inc., 911 F. Supp. 2d 1285, 1296-97

(N.D. Ga. 2012) (citing Bryant and noting that the "defect" arises from the fact that

the manufacturer "did not properly manufacture the drug or include warnings").

Other courts have reached the same conclusion—that Comment k only

applies to a strict liability design defect claim if the product is accompanied by

---

[19]    To the extent Defendant relies on Utah Pattern Instructions on Comment k to
support that only the "could not be made safe" and "benefits justify the use"
elements are necessary, the Pattern Instructions, although instructive, are not a
definitive statement of Utah law.  The introduction to the Pattern Instructions
provides that they are "intended to be an accurate statement[] of the law," but "are
not the final expression of the law."  Introduction, Utah Model Jury Instructions,
https://www.utcourts.gov/resources/muji/index.asp (accessed April 4, 2016).  The
"Judicial Council does not review jury instructions for legal sufficiency," and thus,
"in any case before them, a judge may review a model instruction for legal
sufficiency."  Id.  That is what the Court did here.

adequate warnings.  See, e.g., Dopson-Troutt v. Novartis Pharm. Corp.,

No. 8:06-CV-1708-T-24, 2013 WL 1344732, at *5 (M.D. Fla. Apr. 2, 2013)

("Comment k . . . provides that certain drugs that are 'properly prepared, and

accompanied by proper directions and warnings, [are] not defective nor [are they]

unreasonably dangerous.'  The specific language of comment k requires that the

products, or drugs, be accompanied by proper directions and warnings."); Moss

v. Wyeth Inc., 872 F. Supp. 2d 162, 171 (D. Conn. 2012) (To establish a

Comment k defense to a strict liability design defect claim: "(1) the drug must be

'unavoidably unsafe,' . . . ; (2) the drug must be 'properly prepared,' . . . ; and

(3) the drug must be 'accompanied by adequate warnings,' meaning the drug does

not otherwise suffer from a warning defect.") (emphasis added); Rollins

v. Wackenhut Servs., 802 F. Supp. 2d 111, 123 (D.D.C. 2011) ("Under

Comment k, a drug manufacturer's duty . . . is to properly prepare[ ] the drug and

include proper directions and warning[s] with it."); Freeman v. Hoffman-La

Roche, Inc., 618 N.W.2d 827, 840 (Neb. 2000) ("The comment will apply to

except the prescription drug product from strict liability when it is shown that

(1) the product is properly manufactured and contains adequate warnings, (2) its

benefits justify its risks, and (3) the product was at the time of manufacture and

distribution incapable of being made more safe.") (emphasis added);

<u>Tansy</u>, 890 P.2d at 886 (Comment k "applies only as an affirmative defense in those cases in which the following criteria are met: (1) <u>the product is properly manufactured and contains adequate warnings</u>, (2) its benefits justify its risks, and (3) the product was at the time of manufacture and distribution incapable of being made more safe.") (emphasis added); <u>Savina v. Sterling Drug, Inc.</u>, 795 P.2d 915, 924 (Kan. 1990) ("In order to apply Comment *k,* the product must be properly prepared and must be accompanied by proper directions and warnings . . . . Comment *k* is meant to shield a manufacturer from liability when the product cannot be designed more safely, not when the product was mismanufactured or was not accompanied by adequate warnings.") (italics in original); <u>Allen v. G.D. Searle & Co.</u>, 708 F. Supp. 1142, 1149 (D. Or. 1989) (Comment k "requirements include a showing that . . . the product is accompanied by proper directions and warnings."); <u>Brown v. Superior Court</u>, 751 P.2d 470, 481 (Cal. 1988) ("Comment  k, as we have seen, provides that the maker of an 'unavoidably unsafe' product is not liable for injuries resulting from its use if the product is 'properly prepared, and accompanied by proper directions and warning.'"); <u>Toner v. Lederle Labs., a Div. of Am. Cyanamid Co.</u>, 732 P.2d 297, 305 (Idaho 1987) ("As precondition to its application, comment k requires that the product be 'properly prepared, and accompanied by proper directions and warning . . . .'");

Martinkovic by Martinkovic v. Wyeth Labs., Inc., 669 F. Supp. 212, 216 (N.D. Ill.

1987) ("As a precondition to pursuing a comment k defense, however, Wyeth must

establish that the vaccine was both 'properly prepared, and accompanied by proper

directions and warning.'"); Davis v. Wyeth Labs., Inc., 399 F.2d 121, 128-29 (9th

Cir. 1968) ("As the comment stresses, however, strict liability is avoided in these

situations only where sale is accompanied by proper directions and proper

warnings.").[20]

Comment k requires that a defendant prove that the device at issue was

"properly prepared, and accompanied by proper directions and warning."  The jury

found that Defendant did not prove that it gave proper directions or warnings and,

as a result, Defendant is not entitled to judgment as a matter of law, or a new trial,

on this ground.[21]

---

[20]     Defendant's reliance on Patten v. Lederle Labs., 676 F. Supp. 233, 236
(D. Utah 1987) to support that there is no requirement that a defendant prove the
device was properly manufactured or had proper warnings, also is misplaced.  The
Patten court quotes the language from Comment k that requires proper warnings,
and simply states: "[t]hus, a seller remains strictly liable if the product, otherwise
'unavoidably unsafe,' is defective because it is improperly manufactured or is
accompanied by inadequate warning."  Patten, 676 F. Supp. at 236.  This holding is
consistent with Grundberg.
[21]     Defendant claims that until the Charge Conference it was unaware that it
was required to present evidence regarding the sufficiency of its warnings to prove
its Comment k defense.  (Br. at 19 n.5).  It is, of course, Defendant's obligation to
present evidence to prove its defense.  In this case, Defendant should have been
well-aware of the requirements of Comment k.  The Court, in its August 31, 2015,

2.    Negligent Design Defect Claim

Defendant next moves for judgment as a matter of law on Plaintiff's

negligent design defect claim, arguing that the completed verdict does not show

that the jury found that the hip replacement device had defects resulting from

Defendant's failure to use reasonable care.  (Br. at 20-21).  In the absence of a

specific finding of negligence, Defendant argues, judgment should be entered in

Defendant's favor on Plaintiff's negligent design defect claim.  (Id. at 21).

At the Charge Conference, the parties agreed that the Court should instruct

the jury on strict liability, Comment k, and negligence, and they agreed to the

instruction on these three claims.  Regarding the verdict form, Plaintiff argued that

the Court needed to provide separate findings and sections for strict liability and

negligence.  (Tr. at 1401:19-20).  Defendant argued that if a design defect was not

found, Defendant was not liable for the alleged defect under any theory of liability,

including based on negligence, and thus separate findings on strict liability and

negligence were not required.  (Id. at 1402:7-8).  The parties ultimately agreed on

the Original Verdict Form as drafted and that the "Design Defect" section of the

---

Order, denied summary judgment on Plaintiff's strict liability design defect claim
and noted that "Comment K requires also that the device be 'properly prepared and
marketed, and [that] proper warning is given . . . .'"  (August 31, 2015, Order, at
101) (quoting Restatement (Second) of Torts § 402A, Comment k (1965)).
Defendant was on notice that to prove its Comment k defense, it was required to
prove that it provided proper warnings.

verdict form, specifically Question 1A, was sufficient to record the jury's finding of design defect under both negligence and strict liability claims.

The Court's instruction on negligent design defect—to which the parties agreed—stated that negligence means that a person did not use reasonable care, and that to prevail on this claim, Plaintiff needed to prove that Defendant was negligent and that this negligence was the cause of Plaintiff's injuries. (Id. at 1493:19-1496:19). The Original Verdict Form and Supplemented Verdict Form, when reviewed in light of the instructions on the negligence claim, shows that the jury had to find that Defendant did not exercise reasonable care in designing the hip replacement device.

The parties agreed that the Original and Supplemented Verdict Forms did not require separate strict liability and negligent design findings. (Original Verdict Form at 1-2; Supplemented Verdict Form at 1-2). The parties also agreed that a finding of defective design based on either claim was proof of a design defect for which Defendant is liable. That Defendant is liable for the design defect is sufficient to support the award of damages. Defendant's Renewed Motion based on the findings recorded on the Supplemented Verdict Form is denied.

64

3.   Negligent Misrepresentation Claim

Defendant argues it is entitled to judgment as a matter of law on Plaintiff's negligent misrepresentation claim because there was insufficient evidence as a matter of law to establish Defendant's liability on this claim.

To prevail on a claim for negligent misrepresentation, a plaintiff must prove, by clear and convincing evidence, that the defendant: (1) made a representation; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor made either carelessly or negligently; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.  See, e.g., Shah v. Intermountain Healthcare, Inc., 314 P.3d 1079, 1085 (Utah Ct. App. 2013); Price–Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc., 713 P.2d 55, 59 n. 2 (Utah 1986).  "[A]n omission may be actionable as a negligent misrepresentation when the defendant has a duty to disclose."  Horne v. Impac Funding Corp., No. 2:09-CV-193 TS, 2009 WL 1152080, at *4 (D. Utah Apr. 27, 2009) (quoting Moore v. Smith, 158 P.3d 562, 574 n.12 (Utah Ct. App. 2007)).

The jury was instructed on this claim and concluded that Plaintiff proved that Defendant made negligent misrepresentations which resulted in harm to

Plaintiff.  ([223] at 4).  The jury also found that Plaintiff is entitled to damages in the amount of $450,000 based on Defendant's negligent misrepresentations.  (Id.).

Defendant argues that Plaintiff did not offer sufficient evidence to prove that Defendant: (1) made representations; (2) that were false; or (3) which were made carelessly or negligently.  (Br. at 21-24).  Defendant seeks judgment as a matter of law based on the sufficiency of the evidence, and the Court thus "review[s] all of the evidence in the record [drawing] all reasonable inferences in favor of [Plaintiff]."  See Cleveland, 369 F.3d at 1192-93.  Defendant's Renewed Motion must be denied "unless there is no legal basis upon which the jury could have found for [Plaintiff]."  See Nebula Glass, 454 F.3d at 1210.

a)      Defendant's Representations

Dr. Rasmussen stated at trial the representations made to him by Defendant's representative concerning the hip replacement device.  Dr. Rasmussen testified that in 2005, and in 2006, before he discussed the hip replacement device with Plaintiff, Patrick Fisher and Irina Timmerman—both Defendant's employees—made representations to him regarding Defendant's hip replacement device.  (Tr. at 217:10-20, 218:13-219:5).[22]  Mr. Fisher told Dr. Rasmussen that

---

[22]      Dr. Rasmussen testified also that Jason Baty and Mark Zidek made representations to him regarding Defendant's hip replacement device.  (Tr. at 217:10-20, 218:13-219:5).  Messrs. Baty and Zidek are not Wright Medical

Defendant had developed an A-Class metal that was treated so that it had hardness comparable to ceramic, and that it was "a metal that shouldn't have metal wear debris or metal ion debris, [and would have] much lower wear than just the typical cobalt-chromium metal." (Id. at 219:6-20).  Mr. Fisher declined to tell Dr. Rasmussen the process for hardening the metal because Mr. Fisher was concerned that competitors might learn the process.  (Id. at 219:23-25).  He stated that testing of the metal proved his A-Class metal hardness claims.  (Id. at 219:21-220:2).  Dr. Rasmussen's conversations with the other Defendant representatives, including Ms. Timmerman, confirmed that the treatment of the A-Class metal would significantly reduce the wear rate so that it would give off fewer metal ions.  (Id. at 225:11-19).

Dr. Rasmussen also testified that Defendant marketed and represented the hip replacement device as "being a lifelong hip for patients with an active lifestyle [and] would have all those characteristics of not dislocating, better range of motion, and that it would last—the representation to me, it would last far beyond

---

employees—they are distributors with their own business, though they are "exclusive representatives of Wright Medical." (Id. at 379:19-380:11). Dr. Rasmussen, however, appears to have relied largely on the representations made by Mr. Fisher.  (Id. at 219:6-220:2).  Dr. Rasmussen also relied on the marketing materials produced by Defendant.

anything we had previously seen." (Id. at 214:18-25).  Defendant represented

further that the hip replacement device was:

> the hip for the patient in your practice who is very active, who bikes,
> who hikes, who skis, who does yoga, all types of activity like that.
> The representation is that this is the best hip for that type of a patient.
> And there is no reason why they couldn't have the hip put in through a
> less-invasive procedure, which is something we have always been
> trying to do, less and less invasive procedure, how we open up and
> replace the joint.  And the patients could get up and walk on it
> immediately, and they could return to high-demand activities just as
> quickly as they were able to.  There was no reason why they needed to
> hold back and no reason why they should restrict their activity once
> they were healed.

(Id. at 215:7-20).

Dr. Rasmussen's testimony establishes that Defendant made representations

about the hip replacement device's application for active patients, and that there

was a low risk of metal ion release and the issues associated with it.

Dr. Rasmussen's testimony, corroborated by the testimony of Defendant's

employees,[23] demonstrated that in 2005, and early 2006, before Plaintiff was

implanted with the hip replacement device, Defendant made representations about

the hip replacement device's application for active patients and that there was

minimal, if not lower, risk of metal ion release within the body for those in which

---

[23]    For example, Joel Batts, a former Wright Medical employee, testified that
Defendant marketed its hip replacement device to "younger active people" because
the metal-on-metal device will not wear out and because its larger femoral head
meant no dislocations.  (Tr. at 415:8-14).

the device was implanted.  Drawing all reasonable inferences in favor of Plaintiff,

the Court cannot conclude there was no legal basis upon which the jury could have

found that Defendant made representations—or omitted information it had a duty

to disclose[24]—about the device and its metal ion release characteristics.  <u>See</u>

<u>Cleveland</u>, 369 F.3d at 1192-93; <u>Nebula Glass</u>, 454 F.3d at 1210; <u>Moore</u>, 158 P.3d

at 574 n.12 (The omission of information for which there is a duty to disclose

constitutes a negligent misrepresentation).

b)      <u>Representations Were False</u>

Defendant next argues that Plaintiff failed to show that the representations it

made were false, as opposed to "mere puffery."  (Br. at 23-24).

Defendant represented that the hip replacement device was well-suited for

active patients and that there was lower metal ion release resulting from it because

of the manner in which the A-Class metal was hardened in the manufacturing

process.  These "enhanced hardness" and "less metal ion" representations were,

however, not supported by testing among the active population for which this

product was marketed—a population that included Plaintiff.  Mr. Batts testified

that Defendant had not done any testing to determine whether or not an active

---

[24]      There was testimony that Defendant had done little, and perhaps no, testing
on metal ion release from Defendant's hip replacement device before the
representations were made to Dr. Rasmussen.  The absence of such testing was not
disclosed in the discussions with Dr. Rasmussen.

69

lifestyle generated greater wear.  (Id. at 415:20-416:7).  Mr. Fisher testified that

Defendant was aware that studies established that an increase in activity resulted in

a greater increase in metal wear and metal ion release in implant devices.  (Id. at

610:14-19).  Mr. Fisher confirmed that promotional materials depicting patients

engaging in active lifestyle activities did not mention the increase in metal ion

release that might result from physical activity, and he never disclosed this when

discussing the device with prospective buyers, like Dr. Rasmussen.  (Id. at

610:20-611:23).

Defendant contends the evidence at trial supports that its representations

about the efficacy of the hip replacement device for active patients were not false.

(Br. at 23-24).  Defendant references testimony given by Dr. Jason Snibbe, a

surgeon called as a witness by Plaintiff, to the effect that the hip replacement

device allowed a better range of motion and fewer dislocations.  (Br. at 24) (citing

Tr. at 726:3-727:11).  This testimony, however, does not contradict other evidence

introduced by Plaintiff showing that the hip replacement device produced

increased metal ions, information that was not disclosed by Defendant to actual

and potential buyers.  The Court, in considering this motion, is not entitled to

weigh the competing evidence and its inferences to determine whether the

representations made were false.  See Cleveland, 369 F.3d at 1193.  The Court

70

must "review all of the evidence in the record and must draw all reasonable inferences in favor of [Plaintiff]."  Id. at 1192-93.  Credibility determinations, the drawing of inferences, and the weighing of competing evidence are functions for the jury, not the Court.  Id. at 1193.

Viewing all the record evidence and inferences from it in favor of Plaintiff, the Court cannot conclude that there is no legal basis upon which the jury could have found that Defendant's representations were false.[25]  See Cleveland, 369 F.3d at 1192-93; Nebula Glass, 454 F.3d at 1210.

### c)   Representations Were Made Negligently

Defendant concludes by arguing that Plaintiff did not present any evidence that Defendant's representations were made carelessly or negligently, entitling Defendant to judgment as a matter of law on this claim.

---

[25]   Defendant's argument that its representations were "mere puffery," is unsupported.  Defendant's representations were representations of fact—that the hip replacement device contained a treated metal that reduced metal ion release and was ideal for active patients.  They were not general opinion representations usually attributed to puffery, such as a representation that the hip replacement device is "the best" or "superb," or other subjective, imprecise representations. See, e.g., Boud v. SDNCO, Inc., 54 P.3d 1131, 1135 (Utah 2002).  Rather, they were representations made to persons, including doctors, who were considering what device to implant in their patients.  To the extent Defendant made representations regarding the suitability of the device for active patients, these representations were based on the factual predicate regarding the device design, its metal hardness, and absence of risks which, a jury could find, Defendant did not fully investigate.

Plaintiff presented evidence that Defendant's representations about the efficacy of the hip replacement device for active patients, and the reduced metal ion release, were made without sufficient knowledge to support these claims and thus were made, at least, negligently.  Mr. Batts testified that Defendant had not done any testing to determine whether an active lifestyle generated greater wear. (Id. at 415:20-416:7).  Mr. Fisher testified that Defendant was aware that studies established that an increase in activity resulted in a greater increase in metal wear and metal ion release, but that the promotional materials produced by Defendant showed patients engaging in active lifestyles without mentioning the increased metal ion release, and Mr. Fisher did not mention this when discussing the device with prospective buyers.  (Id. at 610:14-611:23).

Mr. Michael Carroll, Wright Medical's Vice President of Implant Technology, testified that wear debris from metal-on-metal hip implant devices and the reaction of the human body to chromium-cobalt ions was not well understood and was still being evaluated.  (Tr. at 804:3-20, 805:25-806:10, 807:15-808:8).  Mr. Carroll also testified that Defendant was aware of the risk associated with the release of metal ions in the human body, but only tested the hip replacement device for wear, and did not perform any tests to determine the concentration of metal ions released from the A-Class metal or its affect on the

human body.  (Id. at 817:2-818:11, 819:22-821:7).  Mr. Carroll co-authored a document in 2005, regarding "[w]ear performance comparison of ceramic-on-metal and metal-on-metal bearing couples."  (Id. at 859:24-25) (citing Pl.'s Trial Exhibit 814).  The document noted that the "number of wear particles generated from M-o-M bearing couples is large when compared to M-o-P bearing couples.  It has been shown that these particles are responsible for the majority of the metal ions released into blood and tissues.  The clinical implications of these elevated ion levels have yet to be understood."  ([225.3] at 146).  Mr. Carroll's testimony and the 2005 document he co-authored is evidence that Defendant knew of ion particle release in metal-on-metal devices.

Viewing the evidence regarding Defendant's absence of testing to confirm its representations about the safety and efficacy of the hip replacement device and the inference that arise from it, in the light most favorable to Plaintiff, the Court cannot conclude that there was no basis upon which the jury could have found that Defendant's representations were made carelessly or negligently.  See Cleveland, 369 F.3d at 1192–93; Nebula Glass, 454 F.3d at 1210.

The Court cannot conclude that there is no legal basis upon which the jury could have found that Defendant made the claimed false representations about the

hip replacement device carelessly or negligently, and Defendant is not entitled to judgment as a matter of law on Plaintiff's negligent misrepresentation claim.

    D.    <u>Damages</u>

        1.    <u>Punitive Damages</u>

Defendant moves the Court to strike the award of $10 million in punitive damages, or, in the alternative, order a new trial or reduce the award. (Br. at 24). Defendant argues that (1) there is no legal basis for an award of punitive damages; (2) no reasonable juror could have determined that Defendant's conduct warranted punitive damages; and (3) the award was excessive and should, at least, be reduced.

        a)    <u>Legal Basis for Award of Punitive Damages</u>

Under Utah law, punitive damages are allowed only if:

> compensatory or general damages are awarded and it is established by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.

Utah Code Ann. § 78B-8-201.

The jury was instructed on what Plaintiff was required to prove for punitive damages to be awarded. The jury was reminded of the instruction for the award in Question 5A in the Supplemental Verdict Form. Defendant did not object to the charge on punitive damages and did not object to Question 5A in the "Punitive

Damages" section of the Supplemented Verdict Form.  In Question 5A of the

Supplemented Verdict Form, the jury was asked:

> Do you find by clear and convincing evidence that Wright Medical's conduct: (i) was willful and malicious; (ii) was intentionally fraudulent; or (iii) manifested a knowing and reckless indifference towards, and a disregard of, the rights of others, including Ms. Christiansen for any of the below conduct?
>
> [**check all that apply**]
>
> _____ In making misrepresentations as to the hip replacement device?
>
> _____ In fraudulently concealing information as to the hip replacement device?

(Supplemented Verdict Form at 6).  The jury checked the first box, concluding that

Defendant's conduct in making misrepresentations "manifested a knowing and

reckless indifference towards, and a disregard of, the rights of others, including

[Plaintiff]." [26]

Defendant argues that, because Utah law does not provide for an award of

punitive damages based on negligent misrepresentation, the Court should strike the

award in its entirety.  (Br. at 24-25; [223] at 6).  The Court disagrees.

---

[26]     There was no evidence at trial, and Plaintiff does not argue, that Defendant's conduct was "willful or malicious."  The Court also concludes that, in view of the jury's finding that Defendant did not make fraudulent misrepresentations about the hip replacement device, (see [223] at 3), the jury did not find that Defendant's conduct was "intentionally fraudulent."

The Utah Supreme Court has stated that, "[w]hile simple negligence will not support punitive damages, negligence manifesting a knowing and reckless indifference toward the rights of others will."  Diversified Holdings L.C. v. Turner, 63 P.3d 686, 699 (Utah 2002).  The jury in this case was instructed properly on Utah law regarding punitive damages.  The facts required to be proved to award punitive damages were summarized in Question 5A in the Supplemental Verdict Form.  That the jury did not find fraudulent conduct does not preclude an award of punitive damages.  The punitive damages award here was not based only on a finding of negligent misrepresentation, but rather on a finding that Defendant's conduct manifested a knowing and reckless indifference toward the rights of Plaintiff, as required by Utah law.  See Utah Code Ann. § 78B-8-201.

Defendant relies on Fullmer v. Wohlfeiler & Beck, 905 F.2d 1394 (10th Cir. 1990), Near v. Crivello, 673 F. Supp. 2d 1265 (D. Kan. 2009), and Bhandari v. VHA Sw. Cmty. Health Corp., No. CIV 09-0932 JB/GBW, 2011 WL 1336512, at *49 (D.N.M. Mar. 30, 2011), to support that punitive damages cannot be awarded for a negligent misrepresentation claim.  Defendant's reliance is misplaced.

In Fullmer, the Tenth Circuit found that the trial court properly dismissed a claim for punitive damages when the only claims that remained in the case, and on

which punitive damages could have been awarded, were for negligent misrepresentation and negligence.  Fullmer, 905 F.2d 1396.  The trial court in Fullmer had already found there was no basis for claims based on fraud, knowing or reckless misrepresentation, or gross negligence.  Id.  In the absence of a claim on which a global punitive damages award could be based, the Tenth Circuit acknowledged there was not any support for a punitive damages award in that case. Fullmer does not hold that a finding of negligent misrepresentation cannot support an award of punitive damages.  Here, the jury made a separate finding that Defendant's conduct manifested a knowing and reckless indifference towards the rights of others.  Fullmer does not apply.

In Crivello, the district court found that "Kansas courts have not permitted the recovery of punitive damages for negligent misrepresentation."  Crivello, 673 F. Supp. 2d at 1280.  Under Kansas law, punitive damages are permitted where a defendant's conduct indicates malice, fraud, or wanton disregard for the rights of others.  Id. (citing Johnson v. Geer Real Estate Co., 720 P.2d 660, 663 (Kan. 1986)).  Even if Kansas law applied in this case to Plaintiff's claims under Utah law—which it does not—the Crivello court noted that the plaintiff had "alleged willful and wanton conduct in his fraud counts [but not] in his negligent misrepresentation count."  Id. at 1280 n.10.  Because negligent misrepresentation

77

necessarily does not include fraudulent or malicious conduct, to support a claim for punitive damages, the plaintiff would have had to plead that the negligent misrepresentations were "wanton."  Because the plaintiff did not plead wanton conduct in relation to his negligent misrepresentation claim, the Crivello court concluded there was no basis for an award of punitive damages.  See id.  Here, Plaintiff  specifically pleaded, and proved at trial, that Defendant's conduct in making its representations manifested a knowing and reckless indifference towards the rights of others which, under Utah law, is sufficient to support a claim for punitive damages.[27]  Crivello does not apply.

Finally, in Bhandari, the district court, applying New Mexico law, granted summary judgment on plaintiff's request for punitive damages, stating that "[n]egligence, such as negligent misrepresentation, is not a sufficient basis for punitive damages."  Bhandari, 2011 WL 1336512, at *49.  The Bhandari court found that, although "punitive damages are available as long as the wrongdoer's conduct is willful, wanton, malicious, reckless, fraudulent or in bad faith," the plaintiff had already withdrawn any claims that would have supported a claim for willful or malicious conduct under New Mexico law.  Id.  Bhandari also does not

---

[27]     Defendant does not contend Plaintiff did not assert a punitive damages claim, only that the evidence does not support the award in this case.

apply because, unlike Utah law, New Mexico law does not allow punitive damages for knowing and reckless conduct.

Unlike in <u>Fullmer</u>, <u>Crivello</u>, and <u>Bhandari</u>, the question in this case is whether, under Utah law, a negligent misrepresentation claim can support a punitive damages award where, as here, the jury also finds that the defendant's conduct manifested a knowing and reckless indifference towards the rights of others. It is clear that it can. <u>See</u> Utah Code Ann. § 78B-8-201 (allowing punitive damages for conduct that, among other factors, manifests a knowing and reckless indifference toward, and a disregard of, the rights of others); <u>Diversified Holdings</u>, 63 P.3d at 699 ("While simple negligence will not support punitive damages, negligence manifesting a knowing and reckless indifference toward the rights of others will."). Defendant is not entitled to judgment as a matter of law, or a new trial, on this ground.

        b)    <u>Whether Defendant's Conduct Warranted Award of Punitive Damages</u>

Defendant next argues that Plaintiff did not offer sufficient evidence to support the jury's award of punitive damages. (Br. at 25-27). Defendant argues the evidence did not support that Defendant's conduct "manifested a knowing and reckless indifference towards, and a disregard of, the rights of others, including [Plaintiff]." <u>See</u> Utah Code Ann. § 78B-8-201.

To establish "knowing and reckless" conduct under Section 78B-8-201, "a party must prove that the tortfeasor knew of a substantial risk and proceeded to act or failed to act while consciously ignoring that risk. " Daniels v. Gamma W. Brachytherapy, LLC, 221 P.3d 256, 269 (Utah 2009). Utah courts have noted that "[r]ecklessness is subsumed in [the] definition of gross negligence." See id.; see also Bingham v. Roosevelt City Corp., 235 P.3d 730, 742 (Utah 2010) ("in Utah gross negligence is equated with reckless disregard"). Under Utah law, "[g]ross negligence is the failure to observe even slight care; it is carelessness or recklessness to a degree that shows utter indifference to the consequences that may result." Atkin Wright & Miles v. Mountain States Telephone & Telegraph Co., 709 P.2d 330, 335 (Utah 1985). Recklessness includes conduct where "the actor kn[ew], or ha[d] reason to know, . . . of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk." Daniels, 221 P.3d at 269.

Defendant concedes that the jury could have found that Defendant knew of the risks associated with the hip replacement device. (Br. at 26). Defendant argues only that the jury could not reasonably have found that Defendant "acted or failed to act while consciously ignoring those risks." (Id.). Defendant claims the

evidence at trial discredits a finding that it consciously ignored any risks.  (Id.).
The Court disagrees.

Plaintiff presented evidence showing that Defendant knew of the physical
harm that could result from active patients—such as Plaintiff—being implanted
with its metal-on-metal hip replacement device.  For example, Plaintiff presented
evidence that Defendant's marketing materials and representatives repeatedly
represented that the A-Class metal resulted in significantly reduced metal ion
release, and the resultant problems metal ion release would cause.  (E.g., Tr. at
214:18-25, 215:7-20, 219:6-20, 225:11-19, 415:8-14).  Plaintiff presented evidence
that, while it was making these representations and convincing physicians—such
as Dr. Rasmussen—to implant the hip replacement device into patients with active
lifestyles, Defendant was aware that it lacked sufficient knowledge to support these
representations.  (Id. at 415:20-416:7).

Plaintiff also presented evidence supporting that Defendant had limited
knowledge regarding the hip replacement device's wear rate and metal ion release,
or the level at which metal ion release would create health issues in the individuals
implanted with the device.  (Id. at 610:14-19).  Despite this lack of knowledge to
support its claims, Defendant's representatives and employees continued to
promote the hip replacement device to physicians that as the most effective implant

to allow active patients to continue to be active and that had low risk of metal ion release.  (Id. at 610:20-611:23).  The evidence and the inferences that can be drawn from it regarding Defendant's intentions not to make more complete and accurate representations about the hip replacement device is sufficient evidence to support the jury's punitive damages award.

The Court cannot conclude there was no legal basis upon which the jury could have found that Defendant knew or had reason to know "of facts which create[d] a high degree of risk of physical harm to another, and deliberately proceed[ed] to act, or [failed] to act, in conscious disregard of, or indifference to, that risk."  See Daniels, 221 P.3d at 269.  The jury reasonably could have concluded based on the evidence and the inferences that can be drawn from it that Defendant's conduct manifested a knowing and reckless indifference towards, and a disregard of, the rights of others.  See Utah Code Ann. § 78B-8-201.  Defendant is not entitled to judgment as a matter of law, or a new trial, on this ground.

c)    Amount of Punitive Damages Award

"Compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," while "punitive damages serve a broader function; they are aimed at deterrence and retribution."  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416

82

(2003).  "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor."  Id.  "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property."  Id.  The Supreme Court "instruct[s] courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  Id. at 418.[28]

(i)     Reprehensibility

The State Farm court noted that it "should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to

---

[28]    Regarding the last State Farm factor, Defendant argues that the only relevant Utah law governing negligent misrepresentations claim is Section 13-11a-1, which is meant to "prevent deceptive, misleading, and false advertising practices and forms in Utah" and limits a plaintiff's recovery to the "amount of actual damages sustained or $2,000, whichever is greater."  See Utah Code Ann. § 13-11a-1, 4.  Section 13-11a-1 applies only to false advertising claims, not claims for negligent, knowing, or reckless misrepresentations made in relation to a medical device that resulted in physical harm to a person.  Defendant's reliance on Section 13-11a-1 to support a reduction in punitive damages is not persuasive.

achieve punishment or deterrence."  Id. at 419.  To evaluate reprehensibility, a

court must consider whether: "[1] the harm caused was physical as opposed to

economic; [2] the tortious conduct evinced an indifference to or a reckless

disregard of the health or safety of others; [3] the target of the conduct had

financial vulnerability; [4] the conduct involved repeated actions or was an isolated

incident; and [5] the harm was the result of intentional malice, trickery, or deceit,

or mere accident."  Id.[29]

---

[29]    To the extent Defendant argues that its conduct was not "so reprehensible as
to warrant the imposition of further sanctions to achieve punishment or
deterrence," including because the jury found Defendant's conduct was merely
negligent (see Br. at 29-30), Defendant conflates the issue of whether the evidence
was sufficient to support an award of punitive damages under Utah law, with the
analysis required under State Farm to evaluate the amount of the punitive damages
award.  As discussed above, Plaintiff presented sufficient evidence from which the
jury could reasonably conclude that Defendant knew of the risk of physical harm
that could result from active patients—such as Plaintiff—being implanted with
Defendant's device.  Despite this knowledge, Defendant continued to market the
device to physically active patients.  (See Tr. at 214:18-25, 215:7-20, 219:6-20,
225:11-19, 415:8-14, 415:20-416:7, 610:14-611-23).  The Court concluded the jury
determined that punitive damages were warranted because this conduct
"manifested a knowing and reckless indifference towards, and a disregard of, the
rights of others, including Plaintiff."  ([223] at 6).  The evidence produced at trial
supports that Defendant made representations to purchasers of the hip replacement
device knowing that Defendant had limited information about the presence of
metal ions, the risk of metallosis, and the enhanced risk in those patients who had
and would, post-operation, engage in an active lifestyle.  This evidence, and the
inferences from it, coupled with the jury's finding based on the punitive damages
instruction they were given, supports that Defendant's conduct manifested a
knowing and reckless indifference towards Plaintiff, and supports an award of
punitive damages.

Applying these factors, the Court finds the harm caused here was physical and not merely economic, and the jury found that the "tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others."  (See [223] at 6); State Farm, 538 U.S. at 419.  The first two factors weigh in favor of the amount awarded.  Plaintiff did not present any evidence that she—the target of the conduct—had financial vulnerability, and this factor appears neutral.  See State Farm, 538 U.S. at 419.  Defendant's conduct involved more than one action, as Defendant's representatives, and its marketing materials, assured Dr. Rasmussen—and other physicians—that the hip replacement device was suitable and safe for active patients—such as Plaintiff.  (See Tr. at 214:18-25, 215:7-20, 217:10-20, 218:13-219:5, 219:6-20, 219:21-220:2, 225:11-19, 415:8-14).  This factor favors the award.  See State Farm, 538 U.S. at 419.

Finally, the Court considers whether the harm to Plaintiff was the result of intentional malice, trickery, or deceit, or mere accident.  In reviewing the record and drawing all reasonable inferences in Plaintiff's favor, the evidence supports—albeit barely—that Plaintiff's harm was caused by more than a mere accident, and that Defendant's conduct may have been economically motivated.  Plaintiff presented evidence that Defendant was either aware of the risk, or at least knew that it did not have enough information to make representations about the efficacy

of the hip replacement device for physically active patients and the benefit of using the A-Class metal-based device because of its reduced release of metal ions into the human body.  Mr. Fisher testified that Defendant was aware that studies established that an increase in activity resulted in a greater increase in metal wear and metal ion release.  (Tr. at 610:14-611:23).  Mr. Carroll testified that Defendant was aware of the risk associated with the release of metal ions in the human body, but only tested the hip replacement device for wear, and did not perform any tests to determine what concentration of metal ion release from the A-Class metal would be safe.  (Id. at 817:2-818:11, 819:22-821:7).

But Defendant's reprehensibility also must be evaluated in view of the unique circumstances and context surrounding the then-existing hip replacement device industry and development of the device at issue.  Defendant's hip replacement device was an innovation intended to address the concern of doctors, patients, and the replacement industry about hip implant mechanisms, their durability and functionality.  The hip replacement device designs available when Defendant introduced its hip replacement device suffered from a significant risk of device failure by ceramic ball cracking, the limited life for the polyethylene acetabulum cup liners, the small ball articulation limitations and other limitations which had a specific, realistic and practical limitation for those patients who

wanted a physically active lifestyle.  (See, e.g., Tr. at 292:12-18, 726:3-25,

959:4-7, 1158:2-1159:4).[30]  Put another way, one of the driving motivations for the

hip replacement device design was to improve the quality of life for active patients.

(See, e.g., id. at 1267:2-10).  No witness denied this motivation and they did not

deny that the device design was able to improve the prospect for robust physical

activity.  (E.g., id. at 726:3-25).[31]  This laudable objective and motivation is a

significant factor in evaluating the degree of punitive damages awarded in this case

and undercuts Plaintiff's argument that Defendant's only motive in advocating for

and marketing the device was to increase profits.  That myopic litigation theme

ignores the evidence presented at trial that Defendant's goal of offering a better

device, with more dependable functionality and durability, was a substantial

---

[30]     Dr. Rasmussen testified that polyethylene was known to incite inflammation
around the joint and to cause the loosening of the implant, which could cause the
implant's failure.  (Tr. at 292:12-18).  Dr. Snibbe testified that Defendant's hip
replacement device had a greater range of motion and almost no risk of dislocation
because of the large femoral head.  (Id. at 726:3-25).  Ms. Timmerman testified
that metal-on-metal was better, when compared to other types of devices, on
articulation.  (Id. at 959:4-7).  Dr. Harbinger Chadha testified that ceramic devices
that sustained a small crack would quickly "fall[] apart," meaning that a small
fracture of the device would require surgery.  (Id. at 1158:2-11).  Dr. Chadha
testified also that ceramic devices had a smaller femoral ball and, thus, a greater
risk of dislocation, forcing manufacturers to use plastic bearing surfaces, which
increase the long-term risk to the patient.  (Id. at 1158:18-1159:4).
[31]     The evidence suggests that the metal ion release problem that was at issue in
this case was exacerbated by the device having been implanted in an individual
whose lifestyle was uniquely active for someone of her maturity.

motivation to bring the device to market.  This lessens the weight of Defendant's

financial motivation in moving too precipitously to marketing an insufficiently

evaluated implant.

> (ii)   <u>Disparity between harm suffered by Plaintiff and</u>
> <u>punitive damages award</u>

The Court next considers the "disparity between the actual or potential harm

suffered by the plaintiff and the punitive damages award," and with it, due process

considerations.  <u>See</u> <u>State Farm</u>, 538 U.S. at 418.  Although the Supreme Court has

not established a specific acceptable ratio between the compensatory damages

awarded and punitive damages awarded, it has found that "few awards exceeding a

single-digit ratio between punitive and compensatory damages, to a significant

degree, will satisfy due process."  <u>Id.</u> at 425.  The Supreme Court has said that an

award greater than a four-to-one ratio is constitutionally suspect.  <u>Id.</u> (citing <u>Pac.</u>

<u>Mut. Life Ins. Co. v. Haslip</u>, 499 U.S. 1, 23-24 (1991); <u>BMW of N. Am., Inc.</u>

<u>v. Gore</u>, 517 U.S. 559, 581 (1996)).

"[B]ecause there are no rigid benchmarks that a punitive damages award

may not surpass, ratios greater than those we have previously upheld may comport

with due process where a particularly egregious act has resulted in only a small

amount of economic damages."  <u>Id.</u>; <u>see also</u> <u>Johansen v. Combustion Eng'g, Inc.</u>,

170 F.3d 1320, 1339 (11th Cir. 1999) (upholding punitive damages award of

$4,350,000, a ratio of 100 to 1 to the actual damages awarded noting that "substantial punitive damages are warranted for deterrence and, since the actual damages are quite small, must be somewhat disproportional to the actual damage award."). Conversely, the Supreme Court has said that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." State Farm, 538 U.S. at 425. "The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." Id.

Here, the jury awarded $10 million in punitive damages based on Defendant "making misrepresentations as to the hip replacement device," conduct for which it awarded $450,000 in compensatory damages. ([223] at 4). Thus, the ratio between the compensatory damages for Defendant's misrepresentations and the punitive damages is approximately twenty-two to one.[32] Plaintiff's economic

---

[32] Plaintiff argues that the ratio was ten to one, based on the full $1 million in compensatory damages. (Resp. at 31). Punitive damages are only proper when the harm caused is attributable to conduct justifying punitive damages. See, e.g., Utah Code Ann. § 78B-8-201 (allowing punitive damages for conduct that, among other factors, manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.); Moore v. Subaru of Am., 891 F.2d 1445, 1452 (10th Cir. 1989) ("Punitive damages are proper against the manufacturer of a product when the injury is attributable to conduct that reflects a reckless disregard for public safety."). Because the jury concluded the award of punitive damages was based on

damages resulting from her injuries were under $40,000, with the remaining

amount of compensatory damages attributable to intangible, subjective,

non-economic damages for pain and suffering and loss of life's enjoyments.  (See

[225.5] at 3-4).  The compensatory damages awarded here are substantial.  As a

result, a single digit ratio is more consistent with, and required by, constitutional

considerations.  See State Farm, 538 U.S. at 425.

Under Utah law, a punitive damages award above a three-to-one ratio must

be reduced by the court or justified by specific factual findings.  See Crookston

v. Fire Ins. Exch., 817 P.2d 789, 811 (Utah 1991).  Thus, if an award above a

three-to-one ratio is upheld, the trial judge must:

> make a detailed and reasoned articulation of the grounds for
> concluding that the award is not excessive in light of the law and the
> facts.  The judge's articulation should generally be couched in terms
> of one or more of the seven factors we earlier listed as proper
> considerations in determining the amount of punitive damages, unless
> some other factor seems compelling to the trial court.  For example, a
> trial court might conclude that an award should stand, despite a ratio
> that is higher than we have generally approved, because the defendant
> displayed an extremely high degree of malice, e.g., actual intent to
> harm or a high degree of likelihood of great harm based on the
> reprehensible nature of the act.

Id.  The seven factors the Utah Supreme Court mentioned that should be

---

Defendant's misrepresentations—for which it awarded $450,000 in compensatory
damages—the $550,000 in compensatory damages awarded solely on the design
defect claim is not relevant.

considered to justify an award above a three-to-one ratio are:

> (i) the relative wealth of the defendant; (ii) the nature of the alleged misconduct; (iii) the facts and circumstances surrounding such conduct; (iv) the effect thereof on the lives of the plaintiff and others; (v) the probability of future recurrence of the misconduct; (vi) the relationship of the parties; and (vii) the amount of actual damages awarded.

Id. at 808.

Applying these factors confirms that a ratio greater than three-to-one is not justified in this case. There is no evidence of Defendant's "relative wealth," even though that could have been investigated by Plaintiff during discovery.[33] The nature of the misconduct focuses on the misleading promotion of the device for a particular application without disclosure of the metal ion risk, the effect of which was evident in this case, but the pervasiveness of which is unknown in the greater target population for the device. Representations about the hip replacement device will not be further made because it is no longer sold, although the type of conduct in which Defendant engaged ought to be deterred with respect to other products.

The facts and circumstances of this case show there was an acceptable and commendable motivation for Defendant's liability-creating conduct. Use of the device to replace Plaintiff's hip produced for her a multi-year period after implant

---

[33] The Court notes that Plaintiff moved *in limine* to exclude evidence of Defendant's net wealth, which the Court denied in its October 30, 2015, Order. (October 30, 2015, Order, [192] at 44-45).

which allowed Plaintiff to engage in physically demanding sports requiring

significant physical stability and dexterity.  The evidence in this case is not that

Plaintiff was required to have a surgery that she otherwise would not have had.

Indeed, the record supports is that had she been implanted with one of the other

then-available devices—all of which had potential problems for which the industry

created metal-on-metal implants to address—there was a significant prospect she

would have had to undergo revision surgery for a variety of reasons, including

failure of the device for reasons associated with risk attendant to other designs,

damage to the device from a physical event or the fact other devices had generally

shorter useful lives.  The facts here were that Plaintiff had revision surgery likely

sooner—maybe very much sooner—than she would have had with another

implant.  The implant of the hip replacement device improved her ability to engage

in strenuous activity, including downhill skiing.  (Id. at 793:18-795:4).  In short,

the result of the implant likely affected when, not necessarily whether, she would

require revision surgery.

The Court concludes, in considering Utah's guidelines for punitive damages

and the Supreme Court's guidance in State Farm, that a reduction is required.

Defendant's conduct, while justifying an award of punitive damages, did not

"display[] an extremely high degree of malice," or "actual intent to harm."  See

Crookston, 817 P.2d at 811.  Although sufficient to support a finding of reprehensibility, Defendant's conduct was motivated by a patient-centered objective to introduce a device to improve life quality for people like Plaintiff. This balancing urges a low single digit ratio of compensatory to punitive damages. The Court does not minimize Defendant's culpability, or the harm Plaintiff suffered because of Defendant's conduct.  Where, as here, Defendant's conduct, while warranting punitive damages, was not intended to harm Plaintiff or done with actual malice, but was motivated in part by a beneficial purpose, a ratio of twenty-two to one simply is not justified and falls outside constitutional requirements.  See State Farm, 538 U.S. at 425; Crookston, 817 P.2d at 811.

The question remaining then is what amount of punitive damages would be sufficient to deter Defendant's wrongful conduct.  As many courts have noted, this determination is not exact.  It is a matter of an objective evaluation of all the facts, including what motivated Defendant's conduct, the application of judgment, and a determination of what is fair.  For the reasons stated above, based on the facts and circumstances of Defendant's conduct, and the harm to Plaintiff, the Court determines that punitive damages in the amount of $1,100,000 is "reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered."  See State Farm, 538 U.S. at 425-26; Crookston, 817 P.2d at 811.

93

Accordingly, the Court grants Defendant's Renewed Motion on this ground, and amends the judgment to reduce the punitive damages award to $1,100,000.

### 2.   Compensatory Damages

Defendant offers a final argument that the jury's award of $1 million in compensatory damages is contrary to the weight of the evidence, including because it is comprised primarily of "soft damages" for pain and suffering and mental anguish, and her economic damages were approximately $40,000.  (Br. at 32-33; [225.5] at 3-4).  Defendant submits that the Court should order a remittitur and, if Plaintiff does not accept it, the Court should order a new trial.  (Id. at 35).

"In general, a remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence."  Goldstein v. Manhattan Indus., Inc., 758 F.2d 1435, 1448 (11th Cir. 1985); see also First Sec. Bank, 653 P.2d at 598 ("While the finder of fact has wide latitude in determining damages, th[e] Court has authority to reduce the amount of the . . . award where all reasonable minds would conclude [that] the limits have been exceeded.") (internal quotations omitted).[34]

---

[34]     "In the Eleventh Circuit the question of whether or not to grant a new trial or order remittitur in a diversity case is not governed solely by federal law, but instead presents a mixed issue of state and federal law.  State law governs the

The Utah Supreme Court has determined that the "pain and suffering for which damages are recoverable in a personal injury action include not only physical pain but also mental pain or anguish, that is, the mental reaction to that pain and to the possible consequences of the physical injury," and "diminished enjoyment of life . . . ." Judd v. Rowley's Cherry Hill Orchards, Inc., 611 P.2d 1216, 1221 (Utah 1980). "[C]ourts have no hesitancy in allowing and approving substantial awards as general damages which include pain and suffering." Prince v. Peterson, 538 P.2d 1325, 1329 (Utah 1975). "The pain and suffering inflicted upon the mind and the emotions by such wrongful act of another is no less real; and should be no less entitled to be compensated for." Id. "[J]uries are and should be allowed broad discretion in fixing such damages . . . ." Id. at 1329 n.8.

"[W]here there are personal injuries involving both loss of employment, personal inconvenience, and pain and suffering, there is no set formula as to the amount of damages that may be awarded." Jorgensen v. Gonzales, 383 P.2d 934, 936 (Utah 1963). "This is properly left to the sound judgment of a jury of practical people upon the basis of the evidence and in the light of their experience in the

substantive issue of whether the verdict in this case was excessive; however, a Federal standard applies to determine the . . . procedural question of whether a Federal District Court, sitting in diversity, should automatically grant a new trial on the basis of excessive damages." Faulkner v. W. Elec. Co., 98 F.R.D. 282, 283-84 (N.D. Ga. 1983) (citations and internal quotations omitted).

affairs of life."  Id.  Courts should be "reluctant to interfere therewith and will do so only if the amount awarded is so excessive that it clearly appears that it resulted from misunderstanding or from prejudice."  Id.

At trial, Plaintiff presented evidence of the physical pain she suffered as a result of cataclysmic failure of the hip replacement device.  Plaintiff testified that, after the device failure, she "had to have surgery.  Otherwise I would never walk again, basically."  (Tr. at 774:24-775:2).  During the four days she waited to have the hip replacement device replaced, she "had to get around on crutches [and] could not put any weight on the affected leg."  (Id. at 775:12-14).  Plaintiff testified that during these four days, the "only position I was comfortable in was . . . lying flat.  So I was helpless.  I had to be waited on hand and foot [and was basically] an invalid . . . ."  (Id. at 775:14-18).

Plaintiff testified that her recuperation after the revision surgery to replace the failed device was "painful."  (Id. at 778:12).  Plaintiff testified:

> Recovering from joint surgery is miserable.  Being in the hospital is miserable.  And you are in a great deal of pain for six weeks.  Six weeks you have to use something to help you walk.  Eventually you wean yourself off crutches, get on a cane.  And then the serious work starts, trying to build up the strength again around the joint.

(Id. at 778:12-18).  Plaintiff testified that when she tried to return to her pre-failure activities, "there [was] is a lack of confidence [and] fear."  (Id. at 778:24-779:3).

Ms. Ute Fowler, Plaintiff's friend and former co-worker, testified about the change in Plaintiff's lifestyle after the failure of her implant.  Ms. Fowler testified that, prior to the failure of the hip replacement device, Plaintiff was a "very fearless skier.  She could ski all-terrain, which means very steep terrain.  All conditions, powder, ice."  (Id. at 746:16-19).  Ms. Fowler testified also that Plaintiff loved the outdoors and enjoyed hiking in the mountains.  (Id. at 747:7-11).

Ms. Fowler testified that she saw Plaintiff a few weeks after her revision surgery.  (Id. at 747:21-24).  Plaintiff appeared to be in pain from the surgery and the physical therapy.  (Id. at 748:1-6).  Plaintiff was still walking with a cane two months after the revision surgery.  (Id. at 748:15-17).

Ms. Fowler testified that Plaintiff was unable to ski the first year after her revision surgery, but they started to ski together again two years later.  (Id. at 748:22-24).  She stated that Plaintiff "is very careful now.  She stays mostly on very . . . easy runs and intermediate runs."  (Id. at 748:25-749:1).  Plaintiff has "a lot of fear after [she] went through surgery . . . ."  (Id. at 749:1-3).  Plaintiff also no longer hikes the more difficult trails, and instead stays on easy terrain, and she now walks with hiking sticks.  (Id. at 750:18-751:2).

The Court instructed the jury on noneconomic damages, stating:

Noneconomic damages may also be awarded if proved by Ms. Christiansen.  Noneconomic damages are the amount of money that

would fairly and adequately compensate Ms. Christiansen for losses other than economic losses.  Noneconomic damages are not capable of being exactly measured, and there is no fixed rule, standard or formula for them.

If you find Ms. Christiansen suffered noneconomic damages, such damages should be awarded even though they may be difficult to compute.  It is your duty to make this determination with calm and reasonable judgment.  The law does not require the testimony of any witness to establish the amount of noneconomic damages.

In awarding noneconomic damages, among the things that you may consider are the nature and extent of injuries; the pain and suffering, both mental and physical; the extent to which Ms. Christiansen had been prevented from pursuing her ordinary affairs; the extent to which Ms. Christiansen has been limited in the enjoyment of life; and whether the consequences of these injuries are likely to continue and for how long.

(Tr. at 1498:11-1499:6) (emphasis added).

The Utah Supreme Court has made it clear that there is "is no set formula as to the amount of damages that may be awarded," and that determining the amount of damages is "properly left to the sound judgment of a jury . . . ."  Jorgensen, 383 P.2d at 936.  Plaintiff presented evidence that she has suffered "soft damages" of pain and suffering as a result of the failure of the hip replacement device and the "diminished enjoyment of life," that continues to this day.  Defendant's argument that the compensatory damages award is contrary to the evidence because Plaintiff was pain-free until the day before the hip replacement device failed misses the point.  Plaintiff's pain and suffering and the resultant change in her activity level

98

began after Defendant's device failed suddenly.  Defendant argues that Plaintiff's

current activity level undermines her claim that she is "fearful" and is not

consistent with Plaintiff's or Ms. Fowler's testimony.  It is undisputed that Plaintiff

has resumed hiking and skiing, and other activities she enjoyed prior to her hip

replacement failure.  The uncontroverted evidence also shows, however, that

Plaintiff has curtailed engaging the risks she enjoyed taking and the level of

exertion she used to enjoy when engaging in these activities.

   Considering the evidence presented to the jury and the Court's instructions

on noneconomic damages under Utah law, the Court cannot conclude that the

"amount awarded is so excessive that it clearly appears that it resulted from

misunderstanding or from prejudice."  Id.[35]  Defendant is not entitled to a remittitur

---

[35]    To support that a reduction in compensatory damages is warranted,
Defendant relies on First Sec. Bank, in which the Utah Supreme Court reduced a
damage award based on emotional distress from $25,000 to $12,500.  First Sec.
Bank, 653 P.2d at 598.  First Sec. Bank, however, did not involve damages based
on physical pain and injury and the resultant mental anguish, but rather mental
anguish resulting from the temporary unavailability of funds held by a party that
resulted in "no permanent damage."  Id. at 597-98.
       Defendant also relies on Copley v. BAX Glob., Inc., 97 F. Supp. 2d 1164
(S.D. Fla. 2000), in which the district court reduced damages based on emotional
distress from $480,000 to $100,000 because "an award of nearly $500,000.00 for
emotional distress strikes the Court as excessive, in a case where the lost wages
amounted to approximately $20,000.00 and Plaintiff had a higher paying job
within two months of his termination."  Copley, 97 F. Supp. 2d at 1172.  The
Copley court relied on the Eleventh Circuit generally approving, in "employment
cases . . .  awards for mental anguish or emotional distress as high as $150,000.00."

to reduce the amount of compensatory damages, and is not entitled to a new trial on damages.

## IV.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Wright Medical Technology, Inc.'s Renewed Motion for Judgment as a Matter of Law, or in the Alternative, Motion for New Trial and to Amend the Judgment [241] is **GRANTED IN PART** and **DENIED IN PART**.  It is **GRANTED** with respect to Defendant's motion to reduce the punitive damage award.  The award of $10,000,000 in punitive damages is reduced to $1,100,000.  It is **DENIED** on all other grounds.

---

Id.  This case, of course, is not an employment case, and the plaintiff in Copley— unlike Plaintiff here—did not suffer physical injuries or pain.

Finally, Defendant relies on Mecham v. Foley, 235 P.2d 497 (Utah 1951), an assault and battery case in which the Utah Supreme Court reduced compensatory damages from $1,000 to $500 where the total amount of medical expenses did not exceed $52.15, and the "extent of any permanent damage, if any, is very speculative."  Mecham, 235 P.2d at 499.  The court concluded there also were mitigating factors warranting the reduction in compensatory damages, primarily because the plaintiff had a history of fighting.  Id.  Here, Plaintiff presented evidence to show that her mental anguish and the loss of life's enjoyment is ongoing, such that the damage may be permanent, and there are no mitigating factors that would warrant the reduction in damages.  First Sec. Bank, Copley, and Mecham simply do not apply to the compensatory damage award in this case.

**SO ORDERED** this 5th day of April, 2016.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE